Arlizabeth RILEY, Individually and as mother and next friend of Marcellette Riley, an Infant, Plaintiffs,

v.

ADIRONDACK SOUTHERN SCHOOL FOR GIRLS and Dr. George H. Longstaff, Defendants.

No. 73-444-Civ-T-H.

United States District Court, M. D. Florida, Tampa Division.

Dec. 19, 1973.

Morris W. Milton, of Minnis, Williams & Milton, St. Petersburg, Fla., for plaintiffs.

Thomas M. Harris, and Horace Andrews, of Harris, Harris & Andrews, St. Petersburg, Fla., for defendants.

## OPINION

HODGES, District Judge.

On September 5, 1973, Plaintiff, Arlizabeth Riley, individually and as mother and next friend of Plaintiff, Marcellette Riley, an infant, brought this action pursuant to 28 U.S.C. §§ 1343(4), 2201 and 2202 against Defendants, Adirondack Southern School for Girls and Dr. George H. Longstaff, seeking relief from alleged violations of the Civil Rights Act of 1866, 42 U.S.C.A. § 1981. The Complaint alleged that the Defendant private school and its headmaster, Defendant Longstaff, refused to admit to the first grade class the infant Plaintiff, a black child, because of the school's policy, custom and practice of denying admission to children of the Negro race. Thus, it was alleged, Plaintiffs were denied "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens" in violation of the statute. 42 U. S.C.A. § 1981.

On September 11, 1973, Plaintiffs' Motion for Preliminary Injunction came on for hearing. The Court denied Plaintiffs' request that Defendants be required to admit the infant Plaintiff during the pendency of the action, but directed that the case be advanced on the docket for expeditious disposition. The case was thus tried without a jury on October 29, 1973.

## FINDINGS OF FACT

In 1961, Dr. George H. Longstaff founded the Adirondack Southern School for Girls. The school is operated by Adirondack Southern, Inc., a Florida corporation for profit wholly owned by Dr. Longstaff and Dorothy Longstaff, his wife. Dr. Longstaff serves as president of the corporation and as headmaster of the school. Mrs. Longstaff serves as vice president of the corporation and provides office and clerical services as needed. The school is totally private in the sense that no allegation was made and no evidence was offered to show any state or federal funding, or other "state action" of any kind.

The school's physical plant, consisting of at least eight buildings on a six acre campus, is located in St. Petersburg, Florida. The classrooms, dormatories, offices, and other facilities serve the 75 to 80 girls presently enrolled in the day program, grades 1 through 12, and the boarding program, grades 6 through 12. The primary department, grades 1 through 4, has been in operation for three years and consists of only 12 students. There are now four girls in the first grade. The school attempts to emphasize its favorable faculty-student ratio and its excellent sports and recreational facilities. In its advertising Adirondack Southern is described as "A Girl's School maintaining the Moral, Social and Academic values of the past."

Dr. Longstaff testified that there is no written or published policy concerning the minimum standards or other criteria which must be met to gain admission to the school. He exercises a purely subjective judgment in the case of each applicant, basing his decision to accept or not accept upon such considerations as (1) the observed mental ability and level of achievement of the child in

relation to the other students already enrolled; and (2) the general family background which must reflect, in his words, cultured and cooperative parents rather than permissive ones. The prospective student and her parents are both interviewed prior to admission and, while the precise number is unclear from the evidence presented, it was established that at least some children have been refused admission because, in the judgment of Dr. Longstaff, they have not met these standards. Furthermore, of the approximately two dozen students who have been dismissed over the last two years, at least some were asked to withdraw merely because of "anti-establishment" attitudes and disinclinations to accept authority.[1]

Sometime prior to August 27, 1973, Mrs. Riley, reponding to an advertisement in the "yellow pages" of the telephone directory, called Dr. Longstaff for an appointment to discuss the admission of her daughter, Marcellette, to the first grade. During the afternoon of August 27, Mrs. Riley and Marcellette, both black, arrived at the school for the appointment and met Dr. Longstaff. At first, Dr. Longstaff asked Mrs. Riley whether she was applying for the position of cook which was then available and being advertised. Upon learning that Mrs. Riley was there with her daughter as a prospective student, Dr. Longstaff expressed chagrin that he had made this mistake; he had been taken by surprise since the school had not previously had a black applicant.

Early in the ensuing conversation Dr. Longstaff learned that Marcellette was less than six years old [2] and he informed Mrs. Riley that her daughter could not be accepted for that reason. However, since a "brilliant performance" on the

admissions examination might cause him to reconsider his decision, it was suggested that Marcellette take the examination. When Mrs. Riley agreed, Marcellette was escorted by Mrs. Longstaff to a nearby room for testing. After being given instructions, Marcellette was left alone in the room to work. About ten minutes later she began to cry loudly and could not continue the test while alone. Mrs. Longstaff returned, reset the timer and stayed with Marcellete until she completed the first of a two-part test. Discounting the additional time given Marcellette, the child's performance on the abbreviated test was described by the Longstaffs as good. On the other hand, according to Dr. Longstaff, the immaturity manifested by her crying served only to reinforce his initial impression and decision not to enroll her due to the chronological age factor. In addition, following his initial error concerning Mrs. Riley's identity and purpose, it appears that she resented the implication and became somewhat antagonistic in asserting, for example, that she "knew her rights." This display also weighed heavily in Dr. Longstaff's adverse decision, he said, because it hardly coincided with his views of acceptable parental attitude or demeanor quite apart from any consideration of race *per se*.

This is not to say, however, that race was altogether irrelevant in the decisional process that resulted in the refusal to admit Marcellette. The evidence as a whole is irresistably suggestive of a contrary conclusion. The initial, spontaneous assumption that Mrs. Riley was a prospective cook; the fact that no black child has ever attended the school; the image projected by the advertising; and the inference to be drawn from an earlier exchange of letters between Dr.

1. An additional admissions criterion exists with respect to first grade applicants in that students must be at least six years of age at the beginning of school. In the past, however, under-age but otherwise qualified students have been admitted if they possessed, in the judgment of Dr. Longstaff, the emotional maturity of a six year old. In the

public schools of Florida, any child who will attain the age of six years on or before January 1 of the school year is admitted to the first grade in the preceding September. Fla.Stat. 232.01(1) (d), F.S.A.

2. Marcellette's sixth birthday occurred on October 15, 1973.

Longstaff and a parent, are all indicative of racial prejudice.

Based upon close observation of the witnesses and careful scrutiny of their testimony, as well as the other evidence presented, it is the conclusion of the Court that the Plaintiffs' race was at least one of the factors which motivated the Defendants' action in denying Marcellette admission to the school. Conversely, the Court also finds that while the other contributing factors were largely subjective—perhaps even arbitrary—they were not merely pretextual. Similarly subjective appraisals had been made as a regular practice in deciding whether to admit or retain white students, and the Court is not persuaded that, but for her race, the Plaintiff's child would have been accepted.

## CONCLUSIONS OF LAW

Falling as it does within the broad and expanding category of law which includes a wide range of constitutional principles and statutory prohibitions against racial discrimination in general, a firm conceptual grasp of the issue presented is best achieved by first excluding certain established principles that are *not* involved in this case. The question that *is* raised then becomes clearly defined as a new and novel issue, hitherto undecided by the Courts.

■■ This is not a case, for example, within the purview of any of the provisions of the Civil Rights Acts of 1964 or 1968.[3] Neither could the action be maintained on the basis of the Fourteenth Amendment *per se* because of the lack of "state action";[4] nor upon 42 U.S.C.A. § 1983 for the same reason.[5]

Rather, the Plaintiffs' exclusive legal predicate for the claim they assert is 42 U.S.C.A. § 1981 which guarantees to all persons ". . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ."

■ As an aid in analysis, it can be stated preliminarily that since 42 U.S.C.A. §§ 1981 and 1982 are both derived from § 1 of the Civil Rights Act of 1866, 14 Stat. 27, the two sections are fungible with respect to the form of racial discrimination to which they are addressed as well as the constitutional basis which supports them. Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 439–440, 93 S.Ct. 1090, 1095, 35 L.Ed.2d 403 (1973); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097, 1099 (5th Cir. 1970). Hence, cases construing § 1982 are equally authoritative with regard to § 1981.

In relevant part, § 1981 provides:

All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.

In relevant part, § 1982 provides:

All citizens . . . shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property.

---

3. The Civil Rights Act of 1964, particularly Titles II and VII (78 Stat. 243, 42 U.S.C.A. § 2000a; 78 Stat. 253 et seq., 42 U.S.C.A. § 2000e) reaches into the private sector with regard to discrimination in public accommodations and employment opportunities, respectively (based upon the Commerce Clause); and Title VIII of the 1968 Act (82 Stat. 81 et seq., 42 U.S.C.A. § 3601 et seq.) prevents discrimination in private housing transactions (based upon several constitutional theories or sources of authority); but these provisions are aimed at specifically defined areas of commercial relationships, none of which are applicable in this case, and Plaintiffs do not rely upon them.

4. It has been uniformly held by the Supreme Court that "state action" is the *sine qua non* of any application of the Equal Protection Clause of the Fourteenth Amendment in the area of racial discrimination. E. g., Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972); Burton v. Wilmington Parking Authority, 365 U.S. 715, 721–722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961); Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948).

5. Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 475–476, 5 L.Ed.2d 492 (1961).

In Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Supreme Court resurrected § 1 of the Civil Rights Act of 1866 after it had reposed in virtually undisturbed dormancy for a hundred years. Prior to that decision, the state of the law appeared to be that this statute (Section 1982), grounded in the Fourteenth Amendment, did not reach purely private discrimination. Instead, an element of "state action" was deemed to be required. Virginia v. Rives, 100 U.S. 313, 317–318, 25 L.Ed. 667 (1879); The Civil Rights Cases, 109 U.S. 3, 16–17, 3 S.Ct. 18, 25, 27 L.Ed. 835 (1883); Corrigan v. Buckley, 271 U.S. 323, 331, 46 S.Ct. 521, 524, 70 L.Ed. 969 (1926); Hurd v. Hodge, 334 U.S. 24, 31, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948). However, a whole new set of principles was to be born in *Jones*.

The facts in *Jones* concerned the refusal of housing developers to sell a home in an "all white" suburb of St. Louis to the black plaintiffs for the sole reason that they were black. This discrimination was purely private, with no state involvement sufficient to constitute state action under the jurisprudence of the Fourteenth Amendment. The district court's dismissal of the complaint on that ground was affirmed by the court of appeals. The Supreme Court reversed, holding (a) the statute was intended by Congress to bar all racial discrimination in the sale and rental of property, private as well as public, 392 U.S. at 422–437, 88 S.Ct. at 2194–2202; and (b) as so construed the statute was a valid exercise of the power of Congress to enforce the Thirteenth Amendment which, unlike the Fourteenth Amendment, does not require "state action," 392 U.S. at 437–444, 88 S.Ct. at 2202–2205.

The Court next had occasion to construe § 1982 in Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). A white home owner was refused approval by the board of directors of a community park and playground to transfer his member-ship share in the park to his black tenant, the sole reason for the refusal being the tenant's race. The Court found that this leasehold interest coupled with the membership share in the non-profit company organized to offer recreational facilities in the residential area was "property" within the meaning of § 1982. The Court then reiterated and followed *Jones* to the effect that the statute reached purely private discrimination in implementation of the Thirteenth Amendment. Crucial to the Court's conclusion that the statute had been violated on these facts, however, was the determination that the park was not a private social club because there was "no plan or purpose of exclusiveness." Instead, the park was "open to every white person within the geographic area, there being no selective element other than race." 396 U.S. at 236, 90 S.Ct. at 404.

The third and most recent Supreme Court decision adding gloss to § 1982 is Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). A community recreation association operating a swimming pool sold membership shares to local residents under a membership preference plan keyed to the geographical location of the residence of the applicant. One of the plaintiffs was a black owner of a home within the geographical preference area who was refused membership in the association. On these facts, the Court held that since membership benefits were included "in the bundle of rights for which an individual pays when buying or leasing within the area," the benefits were "property" within the meaning of § 1982 which, under *Jones* and *Sullivan*, "operates to guarantee a nonwhite resident, who purchases, leases, or holds this property, the same rights as are enjoyed by a white resident." The Court further held that this guarantee was breached when it found, as in *Sullivan*, that the private association had "no plan or purpose of exclusiveness" and that membership was "open to every white person within the geographic area, there being no selective

element other than race." 410 U.S. at 437–438, 93 S.Ct. at 1094.

Significantly, in each of these cases the discrimination consisted of denial of benefits solely on account of the plaintiffs' race. In *Jones*, any white able to pay the purchase price would be sold a home in the housing development. In *Sullivan*, any white owning or renting property within the area serviced by the community park would receive the membership share of his grantor or lessor. In *Tillman*, any white living within the geographic preference area of the swimming pool would be admitted to membership. In each instance the policy or organization under attack had none of the usual attributes of "privacy" manifested by selected membership. Rather, the property or recreational facility was indiscriminately available to the white public. Stated simply, *but for* their race, each of the plaintiffs would have received the benefits they sought, there being no demonstrated practice of selectiveness or exclusiveness by the defendants on any basis other than race. Since any white could do what these black plaintiffs could not do, the blacks were denied the same right as that enjoyed by whites in violation of § 1982.

In this case the Court has determined as a fact that although the Plaintiffs' rejection was caused in part by racial discrimination, there were other consid-

erations as well; and, of equal or even greater importance, that a policy of subjective exclusiveness is practiced with regard to white applicants. Unlike *Jones*, *Sullivan* and *Tillman*, therefore, this case requires consideration of the limitations, if any, on the sweep of § 1 of the Civil Rights Act of 1866 when it is applied to a truly private school, a school which discriminates in its admissions on grounds other than race.[6] To that extent the Court must sail on unchartered waters.[7]

Since *Jones* and its progeny clearly establish that § 1981 was enacted to implement the Thirteenth, not the Fourteenth Amendment, so that no "state action" is required and private transactions or relationships are brought within the ambit of that section, the precise wording of the statute takes on added importance. It must be remembered that private bias *per se* is not barred by the Constitution. Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 2812–2813, 37 L.Ed.2d 723 (1973). It is significant, therefore, that neither is § 1981 couched in prohibitory or proscriptive terms. It does not make racial discrimination *per se* unlawful. Rather, it affirmatively guarantees equivalency to "all persons" in exercising fundamental rights, including the right to contract.[8] This distinction, to be sure, appears more theoretical than real until one be-

---

**6.** Gonzales v. Fairfax-Brewster School, Inc., 363 F.Supp. 1200 (E.D.Va.1973), was decided under § 1981 and involved a similar situation. However, the court made a factual finding that the admissions policies under consideration evidenced " 'no plan or purpose of exclusiveness' for selection of students 'other than race.' " 363 F.Supp. at 1204. In the same vein, see Bush v. Kaim, 297 F.Supp. 151 (N.D.Ohio 1969) dealing with § 1982. At the appellate level, § 1981 cases generally contain no findings of fact, having come from the district courts on the pleadings. E. g., Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970); Mizell v. North Broward Hospital Dist., 427 F.2d 468 (5th Cir. 1970). Cf. Scott v. Young, 421 F.2d 143 (4th Cir. 1970).

**7.** See *Tillman, supra*, 410 U.S. at 438–439, 93 S.Ct. at 1094, for Mr. Justice Blackmun's

articulation of the issue which this Court must now resolve.

**8.** While not in point, Cook v. Advertiser Co., 458 F.2d 1119 (5th Cir. 1972), tends to highlight the right-to-contract thrust of § 1981 and, to that extent, emphasizes the necessity of distinguishing between racial prejudice or discrimination on the one hand, and denial of the right to contract on the other. In *Cook* the black plaintiffs alleged a violation of § 1981 because a newspaper would not publish their wedding announcements on the "society page," but only on the "black page." The court of appeals affirmed the district court's dismissal of the complaint on the ground that "the transactions between Cook and the [newspaper] . . . did not amount to a contract, implied or otherwise." 458 F.2d at 1122.

gins to consider it in the context of varying fact situations. Assume, for example, that Black and White simultaneously apply for membership in any given organization. Black is refused for reasons R (race) and X (age or sex or any other nonpretextual, albeit arbitrary criteria). White is also refused due to reason X alone. Black has been victimized by racial discrimination, but his *right to contract* was the same as that enjoyed by White. That is, even if the race factor had been eliminated (or disregarded as repugnant in law), the result would remain precisely the same, and would have been obtained for the same reason. And, under those circumstances, if the racial consideration was deemed to be violative of the statute and thus remediable, the inevitable effect would be to confer upon Black a higher or superior right to contract, not the same or equivalent right.[9]

Of necessity, therefore, § 1981 has application only in factual settings like those of *Jones, Sullivan* and *Tillman* in which there is "no plan or purpose of exclusiveness . . . there being no selective element other than race." *Tillman, supra,* 410 U.S. at 438, 93 S.Ct. at 1094. Unless it can be found that, *but for* race the complainant would have succeeded, there is no denial of the rights assured by § 1981.

It bears repeating at this point that § 1981 does not in terms prohibit racial discrimination *per se.* To combat that social evil, both public and private, Congress has provided other proscriptive and remedial legislation which requires redress whenever it is found that considerations of race played a significant role in the regulated transaction. For example, Title VIII of the Civil Rights Act of 1968, 42 U.S.C.A. § 3601 et seq., (the Fair Housing Act), bars discrimination in most private housing transactions. If this case were governed by that Act the result would be different. "It is enough that race was one significant factor [the defendant] considered in his dealings with the men." United States v. Pelzer Realty Co., 484 F.2d 438, 443 (5th Cir. 1973).

 The Court has found as a fact that although race was one of the factors considered, there were other bases as well (consistent with Defendants' dealings with whites); and the evidence is insufficient to warrant a finding that, but for race, the minor Plaintiff would have been admitted to the school. The Court has concluded as a matter of law that no violation of 42 U.S.C.A. § 1981 is shown unless it appears that there was "no plan or purpose of exclusiveness . . . [and] no selective element other than race." It must be, therefore,

Ordered and adjudged that the complaint in this cause is hereby dismissed.

---

9. See The Civil Rights Cases, 109 U.S. 3, 25, 3 S.Ct. 18, 31, 27 L.Ed. 835 (1883).