**Doris Guerriero STEWART, on behalf of herself and others similarly situated, Plaintiff,**

v.

**NEW YORK UNIVERSITY, Defendant.**

**No. 74 Civ. 4126.**

United States District Court,
S. D. New York.

March 16, 1976.

Doris L. Sassower, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant; Simon H. Rifkind, Jay H. Topkis, Steven B. Rosenfeld, Andrea D. Sporer, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Defendant, New York University, moves to dismiss the complaint pursuant to Fed.R. Civ.P. 12(b) and 56(b) on the ground that (a) the Court lacks jurisdiction over the subject matter of the action, (b) the complaint fails to state a claim on which relief can be granted, and (c) defendant is entitled to judgment as a matter of law.

Plaintiff, Doris Guerriero Stewart, is white. She seeks injunctive relief and damages for herself and "others similarly situated" to remedy alleged race, sex, and other discrimination she suffered when she was denied admission to the class entering defendant's School of Law (the "Law School") in September, 1974.

Plaintiff was an honors student at college, has a masters degree, has attended various graduate schools, and has taught at Indiana University and several private schools. She applied to the Law School for admission to the class entering in September, 1974 and was rejected by letter dated April 4, 1974.

Defendant New York University (the "University") is an institution of higher education primarily located in New York City and comprises fifteen colleges and schools, including the Law School.

### The Law School Minority Admissions Policy

It appears that in 1965 the Faculty of the Law School adopted the present "minority admissions policy" pursuant to a recommendation of a specially-appointed Faculty Committee that:

"It will be necessary, we believe, to authorize the Admissions Committee to admit approximately 10–15 students who predictably will succeed in law school, even though their tests scores and college grades place some below our predetermined cut-off line for admissions. In order to prevent the displacement of students who might otherwise have been admitted, we suggest that the first-year class be enlarged by the appropriate number."

The Admissions Committee implemented the recommendation beginning with the 1966 entering class. In the 1974 entering class (to which plaintiff was denied admission), it appears that 35 minority students of the total 362 entering students were "separately considered and admitted" after the Admissions Committee concluded that each had a "good chance for academic success."

For the purposes of this motion to dismiss, the Court accepts the allegations of the complaint as true.

### The Complaint

Plaintiff alleges claims under various civil rights statutes (42 U.S.C. §§ 1981 et seq. and 2000d et seq., and 20 U.S.C. § 1681), and the Fourteenth Amendment, and bases jurisdiction upon 28 U.S.C. §§ 1343 and 1331.

Plaintiff asserts three "causes of action" and seeks to represent three different classes of persons. In the first "cause of action", she sues on behalf of "all white women similarly situated who applied for . . . and . . . were denied admission" to the Law School for the academic year beginning September, 1974. Plaintiff challenges the Law School's minority admissions policy, contending that it is unlawfully discriminatory since some of the applicants who were admitted to the September, 1974 entering class were less qualified than she. Plaintiff, who apparently is enrolled in another law school, alleges she suffered damages in that the graduates from defendant's Law School find employment more easily and earn higher salaries

than "non-graduates" or graduates of "a local law school."

In her second "cause of action" plaintiff sues on behalf of herself and "all women similarly situated" who applied for and were denied admission to the class entering the Law School in September, 1974, and claims that if the minority admissions policy is lawful, then all women, who allegedly have suffered "cultural, educational and social deprivation", should be accorded treatment as minority applicants.

In her third "cause of action", plaintiff sues on behalf of "all persons similarly situated, both women and men, who come from economically, culturally and socially deprived backgrounds", who applied for but were denied admission to the Law School class entering in September, 1974, and alleges that the benefits of any preferential admissions policy should be extended to her and this class of persons.

### Defendant's Contentions

The University contends, in support of its motion to dismiss, that it is strictly a private educational institution chartered in 1831 and is governed by an independent Board of Trustees. Neither the University nor any constituent college or school is part of any state or city university or of any public educational system. The University asserts that the record submitted [1] establishes:

1. The Law School revenues received from any governmental sources are an in-

significant portion of the Law School's total budget.

2. The admissions policies of the Law School, including the minority admissions policy, were adopted solely by the Law School Faculty and are implemented by the Law School Admissions Committee and the Dean of Admissions, without any participation by the University officers or governing bodies.[2]

3. The minority admissions policy was originally adopted by the Law School in October, 1965 as part of a Law School faculty-initiated program designed to remedy "serious underrepresentation of minority groups in the student body . . . and in the legal profession." [3]

### Plaintiff's Contentions

Plaintiff contends, in opposition to defendant's motion, that the issue of jurisdiction should be determined with reference to the University as a whole since the Law School administration and finances are intertwined with those of the University; the Faculty and students of the Law School have access to University facilities; and the Law School Faculty members serve on University committees and teach in other schools within the University.

Plaintiff asserts that the federal, state and city governments have connections with the University and the Law School, including:

1. *Tax exemptions and deductions:* The Law Center Foundation, which is tax ex-

1. The Court has been furnished with defendant's answers to plaintiff's interrogatories and the affidavits of Robert B. McKay, former Dean of the Law School; Anthony Marchionni, Controller of the University; and Millicent A. LeCount, Director of Student Records and Registration.

2. While the University Charter and Bylaws provide that:
 "Subject to the approval of the Board [of Trustees] and to general University policy as defined by the [University] President and the Senate, it is the duty of each faculty to determine entrance requirements of the school under its care . . . .," ¶ 61(b),
 the uncontradicted affidavits establish that neither the Board of Trustees, the President nor

the Senate has ever acted with respect to the admissions policies and standards adopted by any Faculty within the University, including the Law School.

3. In May, 1972, the New York State Board of Regents issued a "Position Paper" entitled "Minority Access to and Participation in Post Secondary Education," which requested colleges and universities to file plans for increased admissions of minority group students. Defendant University points out that the Position Paper did not require any specific plans and had no effect on the Law School faculty's program which had been initiated and adopted at least six years earlier.

empt, receives contributions for the benefit of the Law School, and has expended sums ranging between $436,370 and $1,307,087 annually for the Law School's activities during the academic years 1970/71 through 1973/74.

In addition, the Law School receives tax exempt non-governmental endowment income and gifts or grants for "restricted purpose[s]" which ranged between $1,366,-801 and $1,022,779 during the academic years from 1970/71 to 1973/74, and constituted between 18.2% and 12.2% of the Law School's total revenues per academic year.

The University and the Law School benefit from tax abatements and exemptions from New York City Real Estate Taxes and Water Charges.

2. *Government financing of University buildings:* The New York State Dormitory Authority and the United States Department of Housing and Urban Development ("HUD") have provided financing for (non-Law School) University buildings. Also, the Law Center Foundation, which owns Hayden Hall, the Law School's dormitory facility, is indebted to HUD for $625,000 for the construction of that building.

3. *Student loans and awards from government sources:* In 1974/75 about 350 law students were eligible for New York State Tuition Assistance Plan Awards. It is estimated that the recipients were awarded an average of $300 per year, for a total grant to the Law School of approximately $105,000. The Federal government also provided $441,610 in loans and financial assistance directly to the Law School's students during the 1974/75 academic year.

4. *Grants from government sources:* Pursuant to the New York Education Law § 6401, the state provided between 3.6% and 5.4% of the Law School's revenues per academic year from 1970/71 to 1973/74 and between 3.8% and 6.2% of the University's revenues (excluding those to the Medical Center) during these years. In addition, "restricted purpose" revenues from any government source in 1973/74, for example, equalled 1% of the total Law School revenues, .6% of which were state grants.[4]

5. *Public function:* The Law School not only provides post-graduate education to its students, but also makes its facilities available for public meetings and other law-related organizations' activities. It thereby serves both the needs of its students and of the community.

### Discussion

### I. 42 U.S.C. § 1983

■■■■ Plaintiff first asserts jurisdiction under 42 U.S.C. § 1983, which provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."

Section 1983 confers jurisdiction in cases challenging either the actions of state officials or "the nonobvious involvement of the State in private conduct" and it is "[o]nly by sifting facts and weighing circumstances" that such *state* involvement can "be attributed its true significance". *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45, 50 (1961).[5] "[W]here the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations' . . . in order for the discriminatory action to fall within the ambit of the constitutional prohibition," *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627, 637 (1972) (citation omitted), and the inquiry is

---

4. This was about average over the four academic years from 1970/71 to 1973/74. "Restricted purpose" revenues to the Law School were used for projects such as the Criminal Law Education and Research Center and several clinical law education programs.

5. State, not Federal, governmental involvement is relevant to this inquiry. *See, e. g., Weise v. Syracuse University*, 522 F.2d 397, 404 (2d Cir. 1975).

"whether there is a sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477, 484 (1974). *See Cohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir. 1975) (Stevens, J.).[6] State action has also been found in cases where "[d]irect regulatory involvement has been lacking [but] where the public and private entities were otherwise so closely intertwined that they formed a symbiotic relationship that could not be dissolved." *Weise v. Syracuse University,* 522 F.2d 397, 407 n. 12 (2d Cir. 1975), citing *Burton v. Wilmington Parking Authority, supra. Compare Jackson v. Metropolitan Edison Co., supra.*

The Court of Appeals for this Circuit has held that

"the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon the plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of the complaint." *Powe v. Miles,* 407 F.2d 73, 81 (2d Cir. 1968). *See Winsey v. Pace College,* 394 F.Supp. 1324, 1326–27 (S.D.N.Y. 1975),

later adding that the nature of the right infringed is also relevant. *See Weise v. Syracuse University,* 522 F.2d at 405; *Jackson v. Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975).

■ The minority admissions policy was devised and is implemented by the Law School Faculty and Admissions Committee, respectively, without participation by the University Board of Trustees or Administration. Accordingly, the determination as to whether plaintiff states a claim under

§ 1983 must be made with reference to the state's involvement with the Law School and not to the University as a whole. *See Powe v. Miles, supra. See Cohen v. Illinois Institute of Technology, supra. Cf. New York Jaycees, Inc. v. United States Jaycees, Inc.,* 512 F.2d 856 (2d Cir. 1975) (hereinafter "*Jaycees* ").

■ The five factors to be considered in a § 1983 claim are (*see Jackson v. Statler Foundation,* 496 F.2d at 629):

1. *Degree to Which the "Private" Organization is Dependent on Governmental Aid:* Plaintiff contends that the Law School is "substantially dependent on tax exemptions and deductions" such as the contributions to the school by the tax exempt Law Center Foundation and the tax deductions associated with non-governmental endowment funds, gifts and grants for the Law School. The Court of Appeals for the Second Circuit has held, however, that the granting of tax exemptions creates "only a minimal and remote [government] involvement." *Jaycees,* 512 F.2d at 859. In contrast to *Jackson v. Statler Foundation,* the Law School does not appear heavily dependent upon these tax benefits. Nor does there appear any relationship or "nexus" between the tax exemptions and deductions from which the Law School benefits and the minority admissions policy. *See Grafton v. Brooklyn Law School,* 10 Cir., 478 F.2d 1137 at 1141–42; *Powe v. Miles, supra. See also Jackson v. Statler Foundation,* 496 F.2d at 636–40 (Friendly, J., dissent from denial of reconsideration *en banc* ).

Plaintiff also contends that the payment of state funds under New York Education Law § 6401, the granting of New York State Tuition Assistance Plan Awards to law students, and the "restricted purpose" revenue grants from the state and city make the Law School dependent upon the

---

**6.** The Court of Appeals has stated that a "double standard" exists in determining whether there is state action—"one, a less onerous test for cases involving racial [or other 'invidious' class-based] discrimination and a more rigorous standard for other claims." *Weise v. Syra-* *cuse University,* 522 F.2d at 405; *Jackson v. Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1974). The Court chooses to apply the "less onerous" standard without holding that this standard is required in the circumstances of this case.

state. The state funds paid under § 6401 constitute less than 5.4% per year of the Law School's total revenues, and accordingly are insufficient to render the school a public institution for all purposes. *Cohen v. Illinois Institute of Technology,* 524 F.2d at 825; *Grossner v. Trustees of Columbia University,* 287 F.Supp. 535, 547–48 (S.D.N.Y. 1968). *Cf. Weise v. Syracuse University,* 522 F.2d at 407. The state funding has not been shown to have any relationship with the challenged Law School admissions policy. *See Winsey v. Pace College,* 394 F.Supp. 1324, 1327 (S.D.N.Y.1975). The "restricted purpose" revenues from the state, averaging approximately 1% of the Law School's total annual revenues, are insignificant, *see Weise v. Syracuse University,* 522 F.2d at 407. Moreover, the New York State Tuition Assistance Plan Awards are made to the students, not to the school, are small in relation to the Law School's total revenues, and do not appear to have any relation to the minority admissions policy.

2. *Extent of Governmental Regulation:* Plaintiff contends that state action exists as a result of state regulation of the Law Center Foundation's tax exempt status, and the supervision by the New York Board of Regents and the New York Court of Appeals over the Law School's curriculum or graduating requirements. There is no showing of any state regulation or control of the Law School admissions policies, *see Jackson v. Metropolitan Edison Co.,* 419 U.S. at 357, 95 S.Ct. at 456, 42 L.Ed.2d at 487; *Grafton v. Brooklyn Law School,* 478 F.2d at 1142–43; nor of such close interdependence as to establish a "symbiotic relationship" as that in *Burton v. Wilmington Parking Authority. Compare Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa.1974).

■ 3. *State Approval of the Challenged Actions:* Plaintiff contends that the granting of the tax exempt status connotes approval of the Law School's minority admissions policy. This contention must be rejected; the tax exemption is unrelated to the Law School's admissions policies and is

granted to all charitable and educational organizations. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. at 350–52, 95 S.Ct. at 453–54, 42 L.Ed.2d at 483–85; *Girard v. 94th Street and Fifth Avenue Corp.,* 530 F.2d 66 (2d Cir. 1976); *Jaycees,* 512 F.2d at 859; *Grafton v. Brooklyn Law School, supra. Compare Coleman v. Wagner College,* 429 F.2d 1120 (2d Cir. 1970).

■ 4. *Public Function:* Plaintiff contends that state action exists because the Law School performs the public function of providing education to its students and facilities for public meetings. This contention has repeatedly been rejected by the courts in this Circuit. *See, e. g., Weise v. Syracuse University,* 522 F.2d at 404 n. 6.

■ 5. *Claim to Recognition as a "Private" Organization in "Associational or other Constitutional Terms":* As stated by the Court of Appeals,

"we do of course recognize that a private university can make valid claims to retaining its private status, but there comes a point where those claims are outweighed by the harm wrought on the public interest by 'private' misdeeds—that is by the offensiveness of the conduct." *Weise v. Syracuse University,* 522 F.2d at 407 (footnote omitted).

Without reaching the merits of plaintiff's claims, the Court finds that the minority admissions policy certainly is not of the "offensive" nature referred to in *Weise* so as to outweigh the Law School's claims to private status. *See Wahba v. New York University,* 492 F.2d 96, 101–02 (2d Cir. 1974); *Bright v. Isenbarger,* 314 F.Supp. 1382, 1391–92 (N.D.Ind.1970), *aff'd,* 445 F.2d 412 (7th Cir. 1971); H. Friendly, "The Dartmouth College Case and The Public-Private Penumbra," XII Texas Quarterly, Univ. of Texas at Austin (No. 2, Supp. 1969).

■ Noting that

"[e]ach of these factors is material; no one factor can be conclusive." *Jackson v. Statler Foundation,* 496 F.2d at 629,

the Court has considered the five factors and concludes that plaintiff has not shown

the requisite state action to state a claim under § 1983.[7]

## II. 42 U.S.C. § 2000d et seq. and 20 U.S.C. § 1681 et seq.

 Plaintiff also contends that she states claims against the University under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (hereinafter "§ 2000d"), which provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded for participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance,"

and under 20 U.S.C. § 1681 which prohibits discrimination on the basis of sex in an "education program or activity receiving Federal financial assistance."

To support jurisdiction under these sections, plaintiff points to the Federal student loans, "restricted purposes" grants, tax deductions and exemptions from which the Law School benefits, as well as to the $625,-000 indebtedness to HUD for the construction of Hayden Hall, the Law School dormitory. Defendant contends that this financial assistance is insufficient to support the Court's jurisdiction since said assistance was not "received by the particular activity involved in the alleged discrimination," specifically the operation of the minority admissions policy.

To implement §§ 2000d and 1681, Congress delegated responsibility for the enforcement of the anti-discrimination policy to each "federal department and agency [with authority] to extend Federal financial assistance to any program or activity, by way of grant, loan or contract." 42 U.S.C. § 2000d–1; 20 U.S.C. § 1682. In so doing, Congress limited the sanctions the agencies could impose for violations of these statutes. Section 2000d–1 contains what is known as the "pin-point provision" which

provides that compliance with § 2000d may be effected by the termination of such program or activity in which discrimination is found, but that such termination shall be

"limited to the particular political entity, or part thereof, or other recipient [of Federal financial assistance] as to whom such a finding has been made, and . . *shall be limited in its effect to the particular program, or part thereof,* in which noncompliance has been so found." 42 U.S.C. § 2000d–1 (emphasis added). *Accord,* 20 U.S.C. § 1682.

Section 1681 provides that the term "educational institution" shall mean each "school, college, or department" when the institution is "composed of more than one school, college, or department which are administratively separate units." 20 U.S.C. § 1681(c). *See Gautremix v. Romney,* 457 F.2d 124 (7th Cir. 1972); *Board of Public Instruction of Taylor Co., Fla. v. Finch,* 414 F.2d 1068, 1077 (5th Cir. 1969) (hereinafter *"Finch ")*· House Report No. 914, 1964 U.S. Code Cong. & Admin.News, pp. 2391, 2400–01; *id.* at pp. 2425–26, 2453–54, 2469–74, 2510–12 (Comments by various Congressmen about § 2000d *et seq.*).

While Congress did not expressly define the degree of governmental involvement with a defendant required for a private action under these sections, the cases indicate that a private claimant must show greater government involvement with the defendant when that defendant is a non-governmental entity, than when the private claimant sues the governmental entity directly, or when the government itself institutes the action. *Compare Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C. 1974) (school and veteran against Administrator of Veterans' Affairs for review of decision to discontinue payments of loans to students at plaintiff school); *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir. 1967) (black students' parents' suit

---

**7.** Insofar as the complaint seeks to assert a claim directly "arising under" the Fourteenth Amendment, plaintiff has failed to state a claim upon which relief can be granted. The criteria for determining what constitutes state action

under the Fourteenth Amendment are the same as under § 1983. *See United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). *See also Jaycees, supra.*

against public school board which refused to admit black students to local public school); *McGlotten v. Connally*, 338 F.Supp. 448 (D.D.C.1972) (3-judge court) (black suing Secretary of Treasury to enjoin the granting of tax benefits to fraternal organization); *McLeod v. College of Artesia*, 312 F.Supp. 498 (D.N.M.1970) (black students' suit against their college for, *inter alia*, racial discrimination). *See also* H. Friendly, "The Dartmouth College Case and The Public-Private Penumbra," *supra*. Also, guidance is found in the "pin-point provisions" of § 2000d–1 and § 1682, as well as in the analysis developed under the state action doctrine associated with § 1983. *See Junior Chamber of Commerce of Rochester, Inc. v. United States Jaycees, Tulsa, Okl.*, 495 F.2d 883, 887 (10th Cir.), *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). *Compare Jackson v. Metropolitan Edison Co., supra.* In sum, plaintiff must show that the Federal financial assistance received by the Law School constitutes more than a *de minimus* portion of its annual revenues and that there is some material connection between said assistance and the minority admissions policy challenged herein. *See McLeod v. College of Artesia, supra.*

▮ The student loans, paid to the students, not to the school, and the restricted purpose grants from the Federal government are not awarded in connection with the minority admissions policy, and consequently are irrelevant to this Court's jurisdiction under these sections. *Id., Finch, supra.*

The Court of Appeals for the Second Circuit has held that the granting of tax deductions and exemptions "creates only a minimal and remote involvement" by the government in the activities of the recipient, *Jaycees*, 512 F.2d at 859. *See Walz v. Tax Commission*, 397 U.S. 664, 675–76, 90 S.Ct. 1409, 1414–15, 25 L.Ed.2d 697, 705

(1970); *Junior Chamber of Commerce of Rochester, Inc. v. United States States Jaycees, Tulsa, Okl.*, 495 F.2d at 888. *Cf. Finch, supra*, and the Court finds the Federal tax benefits granted to the Law School insufficient to support a claim under § 2000d or § 1681.[8]

Similarly, the indebtedness to HUD with respect to Hayden Hall, the Law School dormitory, does not help plaintiff, since the discrimination alleged here does not involve Hayden Hall, but rather the minority admissions policy. *Compare Hawthorne v. Kenbridge Recreation Association, Inc.*, 341 F.Supp. 1382 (E.D.Va.1972), where defendant, a non-profit membership corporation, constructed as its only asset a "whites only" recreational park with money obtained through a Federal loan.

Accordingly, the Court finds that plaintiff has failed to state a claim under § 2000d or § 1681.

### III. 42 U.S.C. § 1981

Plaintiff also asserts her claims under 42 U.S.C. § 1981, which provides

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment. . . ."

Plaintiff states that her "basic claim" is that she would have been admitted to the Law School if she had been considered under the minority admissions policy criteria, and thus was discriminated against on the basis of her race. She alternatively contends, relying on *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), that she has standing to raise "the rights of the members of the non-white minority who

---

8. The cases cited by plaintiff from the District of Columbia do not apply here since those cases involved actions against a government agency to enjoin that agency from granting financial assistance. *See McGlotten v. Connally, supra; Green v. Connally*, 330 F.Supp. 1150 (D.D.C.), *aff'd sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (mem.); *Green v. Kennedy*, 309 F.Supp. 1127 (D.D.C.), *appeal dismissed sub nom. Cannon v. Green*, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539. (1970).

have been equally discriminated against by defendant's minority admissions program." *See also Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386, 392 (1969). Defendant contends that § 1981 does not provide a cause of action for white persons who are the victims of alleged racial discrimination, *Agnew v. City of Compton,* 239 F.2d 226 (9th Cir. 1956), *cert. denied,* 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (1957); *Kurylas v. United States Department of Agriculture,* 373 F.Supp. 1072, 1075–76 (D.D.C.1974), *aff'd,* 169 U.S.App.D.C. 58, 514 F.2d 894 (1975); *Ripp v. Dobbs Houses, Inc.,* 366 F.Supp. 205, 211 (N.D.Ala.1973); *Perkins v. Banster,* 190 F.Supp. 98, 99 (D.Md.), *aff'd,* 285 F.2d 426 (4th Cir. 1960). *See Van Hoomissen v. Xerox Corp.,* 368 F.Supp. 829 (N.D.Cal.1973), and, in the alternative, that § 1981 does not apply to private educational institutions, *see Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182, 1196–1203 (D.Conn.1974). *See also McCrary v. Runyon,* 515 F.2d 1082 (4th Cir. 1975), *cert. granted,* 423 U.S. 945, 96 S.Ct. 354, 46 L.Ed.2d 276, 44 U.S.L.W. 3279 (1975).

Section 1981 was originally enacted as part of § 1 of the Civil Rights Act of 1866,[9] pursuant to Congress' power under the Thirteenth Amendment, and was intended to "protect a limited category of rights, specifically defined in terms of racial equality." *Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925, 933 (1966). *See, e. g., Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 478 F.2d 979, 993–94 & n.26 (1973); *Jones v. United Gas Improvement Corp.,* 68 F.R.D. 1, 15 (E.D.Pa.1975).

Senator Lyman Trumbull of Illinois, the Senate floor manager of the Civil Rights Act of 1866, stated expressly that the bill was intended to protect "white men as well as black men" and

> "declares that all persons in the United States shall be entitled to the same civil rights . . . . [The bill is intended] to secure equal rights to all the citizens of the country." Cong. Globe, 39th Cong., 1st Sess. 599 (1866).

The House, in amending the bill to include, *inter alia,* the phrase "as enjoyed by white citizens," apparently did not intend to change this aspect of the meaning of the bill. *See* Cong. Globe, *supra* at 1117–18. When the bill was resubmitted to the Senate for consideration of the House amendments, Senator Trumbull stated that

> "these words are superfluous. I do not think they alter the . . . meaning of the bill." *Id.* at 1413.

*See Spiess v. C. Itoh & Co. (America), Inc.,* 408 F.Supp. 916 (S.D.Tex.1976); *Hollander v. Sears, Roebuck & Co.,* 392 F.Supp. 90 (D.Conn.1973).[10]

The wording of § 1981 supports the view that Congress meant to give persons of all races a claim under § 1981 for racial discrimination. The phrase "as enjoyed by white citizens" provides the standard against which the rights of the protected individuals must be measured. The class of protected persons under the statute consists of "[a]ll persons within the jurisdiction of the United States." *See Baca v. Butz,* 394 F.Supp. 888, 890 & n.3 (D.N.M. 1975).

The Court concludes that a white person, just as a nonwhite, has standing to sue an individual of any race, a business entity, or a governmental entity under § 1981 on appropriate claims of racial discrimination. *Spiess v. C. Itoh & Co. (America), Inc., supra; Baca v. Butz, supra; Hollander v. Sears, Roebuck & Co., supra;*

---

**9.** Act of April 9, 1866, c. 31, § 1, 14 Stat. 27, re-enacted by § 16 of the Enforcement Act of 1870, Act of May 31, 1870, c. 114, § 16, 16 Stat. 140, 144, and codified in § 1977 of the Revised Statutes of 1874, now 42 U.S.C. § 1981. 42 U.S.C. § 1982 is also a recodification of § 1 of the Civil Rights Act of 1866.

**10.** President Johnson vetoed the bill on March 27, 1866 (*see id.* at 1679–80), but the veto was overridden by the Senate and the House on April 6 and 9, 1866, respectively.

*WRMA Broadcasting Co. v. Hawthorne*, 365 F.Supp. 577 (M.D.Ala.1973); *Central Presbyterian Church v. Black Liberation Front*, 303 F.Supp. 894 (E.D.Mo.1969); *Gannon v. Action*, 303 F.Supp. 1240 (E.D.Mo.1969), *aff'd in part and remanded in part on other grounds*, 450 F.2d 1227 (8th Cir. 1971).[11]

■ However, there remains the issue as to whether plaintiff here states a claim under § 1981.

Section 1981 refers to the "right . . to make and enforce contracts." Section 1982, also derived from § 1 of the Civil Rights Act of 1866, provides that

> "All citizens . . . shall have the same right . . . as is enjoyed by white citizens to inherit, purchase, lease, sell, hold and convey real and personal property."

In *McCrary v. Runyon*, 515 F.2d 1082 (4th Cir. 1975), *cert. granted*, 423 U.S. 945, 96 S.Ct. 354, 46 L.Ed.2d 276, 44 U.S.L.W. 3279 (1975), the Court of Appeals for the Fourth Circuit divided on whether the application of § 1981 is as broad as that of § 1982. *See also Cornelius v. Benevolent Protective Order of Elks, supra*. The Supreme Court has granted certiorari and presumably will render a decision later this term. Pending a decision by the Supreme Court, the following discussion in the dissenting opinion in *McCrary*, in which three of the Circuit Judges joined, is persuasive:

> "We believe that the majority has been unduly impressed by the historical relationship between §§ 1981 and 1982 and has failed to discern the difference between the right to purchase real estate and the right to attend an independent school inferred from the right to 'make and enforce contracts.' The purchase of real estate, with its attending perquisites [sic], is a commercial transaction pure and simple. . . . On the other hand, the

relationship of teacher and student is one of status, which is related to the contract concept in the same way that the status of husband and wife may be said to grow out of a contract of marriage. The contract aspect of the situation is minor and incidental and serves no purpose other than as a door opener in the present case . . . . The right to make and enforce contracts does not imply a right to coerce an unwilling co-contractor into making any and every variety of contract.

> \* \* \* \* \* \*

> "It is one of the missions of law to balance conflicting social interests so as to give the maximum of protection to each. Which interest will prevail will depend therefore upon special considerations in each context in which the conflict is presented.

> \* \* \* \* \* \*

> "The word 'right' is ambiguous. . . . It may mean an immunity from legal disability to own property or make a contract. . . . It is not necessary to assume that the word means the same in all contexts.

> \* \* \* \* \* \*

> "Insofar as society's interests in educational opportunity for all of its citizens and the removal of invidious discrimination are weighed against society's interests in true independence of non-public educational institutions and freedom of association, especially in connection with close, intimate relationships, we believe that, unlike the right to purchase property involved in *Jones v. Alfred H. Mayer Co.*, the balance is in favor of construing the right to make and enforce contracts protected by § 1981 as being a freedom from legal disability and not as being

---

11. This ruling is of course subject to reconsideration, if necessary, after the Supreme Court renders a decision in *McDonald v. Sante Fe Trail Transportation Co.*, 513 F.2d 90 (5th Cir. 1975), *cert. granted*, 423 U.S. 923, 96 S.Ct. 264, 46 L.Ed.2d 248, 44 U.S.L.W. 3253 (1975) (whether a white person can state a claim under § 1981). *McDonald* involved facts signifi-

cantly distinguishable from those in this case, as noted by Judge Bue, who held that the white plaintiffs could not sue under § 1981. Moreover, Judge Bue has subsequently reversed his view on this issue, notwithstanding the Fifth Circuit's affirmance in *McDonald*. *See Spiess v. C. Itoh & Co. (America), Inc., supra*.

extended to prohibiting a non-public institution from operating on a racially segregated basis." *Id.* at 1092–96, *passim.* *See Player v. State of Alabama, Dep't of Pensions and Security,* 400 F.Supp. 249, 264–65 (M.D.Ala.1975); *Cook v. Advertiser Co.,* 458 F.2d 1119, 1122 (5th Cir. 1972). Indeed, the Law School's minority admissions policy is a good faith effort by the school to correct past discrimination. If plaintiff here has a claim under § 1981, then every person regardless of his or her race would have a claim that the Law School had too few students of that race, and there would be no end to the possible litigation. According to plaintiff's argument, it could as well be said that § 1981 requires the untenable proposition that every private educational institution have a racial composition reflecting the community, or even the United States.

The complaint does not allege, nor does the record submitted indicate, that the Law School admits students solely on the basis of race, *see Riley v. Adirondack Southern School for Girls,* 368 F.Supp. 392, 395–98 (M.D.Fla.1973). *Cf. Cook v. Advertiser Co.,* 458 F.2d 1119 (5th Cir. 1972). *Compare Tillman v. Wheaton-Haven Recreation Association, Inc.,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Jones v. Alfred H. Mayer Co., supra; McCrary v. Runyon, supra,* and, again, the minority admissions policy is merely a good faith effort to remedy past discrimination.

Accordingly, plaintiff does not state a claim under § 1981.

## Conclusion

The plaintiff has not stated a claim under any of the statutes on which she relies [12]

and accordingly defendant's motion to dismiss is granted.

It is so ordered.

---

**12.** In her brief, plaintiff contends that defendant conspired to deprive her of her rights under § 1985(3). *Griffin v. Breckinridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The complaint contains no allegations as to a conspiracy and the facts alleged in the complaint fail to establish that two or more persons acted together to conspire to deprive her of any protected rights. *See Girard v. 94th Street and Fifth Avenue Corp.,* 530 F.2d 66 (2d Cir. 1976); *Powell v. Workmen's Compensation Bd.,* 327 F.2d 131, 137 (2d Cir. 1964); *Cole v. University of Hartford,* 391 F.Supp. 888 (D.Conn.1975). *See Blackburn v. Fisk University,* 443 F.2d 121, 124 (6th Cir. 1971). Accordingly, plaintiff fails to state a claim under § 1985(7).