409 F.2d 593
 Donald BROWNS, Ruth Buechler, Mitchell G. Crane, and others similarly situated, Appellants,
v.
Maurice MITCHELL, Chancellor of the University of Denver, Barbara Mertz, Dean of Students, John Evans, Jr., Chairman of the Board of Trustees, Colorado Seminary, a Colorado Corporation, and University of Denver, a Colorado Corporation, Appellees.
 No. 10118.
 United States Court of Appeals Tenth Circuit.
 January 31, 1969.
 Rehearing Denied April 2, 1969.
 
 Walter C. Brauer, III, Denver, Colo. (Susan Graham Barnes, Lakewood, Colo., on brief), for appellants.
 James A. Clark, Denver, Colo. (Winner, Berge, Martin & Clark, and Henry, Cockrell, Quinn & Creighton, Denver, Colo., on brief), for appellees.
 Before MURRAH, Chief Judge, and HILL and SETH, Circuit Judges.
 MURRAH, Chief Judge.
 
 
 1
 In April, 1968, one of the Plaintiffs (Appellant here), Ruth Buechler, and another student at the University of Denver, a private institution, met with Chancellor Mitchell to present certain demands[1] on behalf of themselves and approximately 40 other students. They told the Chancellor that if these demands were not met a sit-in demonstration would be staged. They were advised by the Chancellor that the demands could not be met and that any sit-in would receive the severest discipline.
 
 
 2
 Subsequently about 45 students, including the three named plaintiffs, physically occupied a non-public area of the Registrar's Office. After reviewing the situation the Dean of Students warned the demonstrators that if they did not leave the area within five minutes they would be dismissed.[2] Six students left and after ten to fifteen minutes the remaining 39 were summarily dismissed. The Director of Security of the University advised the students they were violating a city ordinance and after a period of time called the police who arrested the students.
 
 
 3
 At the time of dismissal the students were advised of their right to appeal the dismissal to the University Conduct Review Committee. All 39 initiated the appeal procedure and were specifically notified of the charges and informed that their University records would be made available to the Committee. After individual, inquisitory hearings the Committee imposed one year disciplinary probation in lieu of dismissal, and so informed the Chancellor. After reviewing the Committee's report, the individual student's record, and random samplings of the tape record, the Chancellor recommended one year suspension to the Board of Trustees. This recommendation was unanimously approved by the Board and the students were thereupon suspended.
 
 
 4
 The appellants, all suspended students, bring this class action under 42 U.S.C. § 1983 seeking injunctive relief in the nature of reinstatement. The asserted grounds for the relief sought are that the disciplinary action of the University was done under color of State law and must, therefore, conform to Fourteenth Amendment due process; and that the proceedings which ultimately resulted in the suspension were lacking in procedural due process. The trial judge deliberately avoided the "state action" issue[3] and found that procedural due process had been afforded. On review we reach only the threshold issue whether the disciplinary acts of the University of Denver constitute action under color of State law. Being of the opinion that they do not we affirm the dismissal of the action.
 
 
 5
 It is axiomatic that the due process provisions of the Fourteenth Amendment proscribe state action only and do not reach acts of private persons unless they are acting "under color of state law." United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441 (1948); and the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). As Mr. Justice Clark put it in Burton, supra 365 U.S. at 722, 81 S.Ct. at 860:
 
 
 6
 It is clear, as it always has been since the Civil Rights Cases * * * that "Individual invasion of individual rights is not the subject-matter of the [Fourteenth] amendment," * * * and that private conduct abridging individual rights does no violence to the Equal Protection Clause [and likewise the Due Process Clause] unless to some significant extent the State in any of its manifestations has been found to have become involved in it.
 
 
 7
 Inasmuch as the Civil Rights Act of 1871, 42 U.S.C. § 1983, is concerned only with state action and does not concern itself with federal action we lay to one side as entirely irrelevant any evidence concerning the participation of the federal government in the affairs of the University. See Grossner v. Trustees of Columbia University, 287 F.Supp. 535, 547 (S.D.N.Y.1968). And so it is state action with which we are here concerned and more particularly, to paraphrase Mr. Justice Clark in Burton, supra at 725, 81 S.Ct. 856, whether the State of Colorado has "so insinuated itself" in the affairs of this private University as to be judicially "recognized as a joint participant in the challenged" disciplinary proceedings.[4]
 
 
 8
 The courts have judiciously avoided laying down "a precise formula for recognition of state responsibility" based upon State involvement in the affairs of an otherwise private University or enterprise preferring the inductive process of "sifting facts and weighing circumstances." Burton, supra at 722. See also Commonwealth of Penn. v. Brown, 270 F.Supp. 782, 788 (E.D.Penn. 1967). We turn, therefore, to the asserted indicia of State participation to ascertain the nature and extent of the conduct here involved. Cf. Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959, 966 (4th Cir., 1963).
 
 
 9
 The Colorado Seminary was incorporated as a religious corporation by the Methodist Episcopal Church under the laws of the Territory of Colorado. The University of Denver was later founded and incorporated by the Colorado Seminary under the laws of the State of Colorado as a private, non-profit, tax-exempt, educational institution. The two corporations continue to exist in duality as a single, non-tax-supported university. The Board of Trustees of Colorado Seminary is appointed by the annual conference of the Methodist Episcopal Church. The original Board of Trustees of the University of Denver was elected principally by officers of the Methodist Episcopal Church and the Board of Trustees of Colorado Seminary. Since then the University Board has changed to staggered terms of self-elected members.
 
 
 10
 The University receives no State funds. Indeed, the State of Colorado is prohibited by its Constitution from making appropriations for any educational activity not under the "absolute control of the State." Article V, § 34. Like all other religious and charitable corporations the University is tax exempt and, by virtue of the original territorial charter incorporating Colorado Seminary, the University receives a special tax exemption not enjoyed by other like corporations in that the income from its non-educational, income producing property is also non-taxable. Colorado Seminary v. Board of County Commissioners, 30 Colo. 507, 71 P. 410 (1903). Counsel for the students seem to suggest that this special tax exemption (approximately $210,000 per year) is equivalent to a financial contribution to the general revenues of the University and when considered as a bounty in furtherance of the public function of educating people it becomes an insinuating influence sufficient to place the University in a "position of inter-dependence" with the State and thereby becomes an arm of the State.
 
 
 11
 Assuming that the special tax exemption is tantamount to a financial contribution and that it was intended to and does generally promote public education there is nothing in the record to indicate that this bounty is or can be utilized in any way to dictate or influence the administration of University affairs. And even more critically there is no suggestion that the claimed involvement is in any way associated with the challenged activity. See Grossner, footnote 4 supra. The benefits conferred, however characterized, have no bearing on the challenged actions beyond the perpetuation of the institution itself. This we hold to be far short of the requisite State involvement. Cf. Powe v. Miles, 407 F.2d 73 (2nd Cir. 1968).
 
 
 12
 Another approach to the state action concept is based upon the rationale of Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) and Amalgamated Food Employees v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) where areas of private property were found to be so completely dedicated to public uses as to be deemed public places for the exercise of First and Fourteenth Amendment rights. The company town in Marsh was held to be the "functional equivalent" of an Alabama city and the situation in Logan Plaza sufficiently analogous to Marsh to bring the asserted First Amendment activities in each within the protection of the Fourteenth Amendment. Thus, when the State imposed criminal punishment on the Jehovah's Witness for trespass in Marsh, and the State court enjoined the picketing in Logan Plaza, they deprived the parties in each case of vested Fourteenth Amendment rights.
 
 
 13
 The students in our case suggest that the various conventional public services and functions performed by the University give it the color of a public institution and thus may be likened to the company town in Marsh, and the public way in Logan Plaza. From this they seem to rationalize that the disciplinary action complained of was done under color of state law, hence amenable to due process and a violation of civil rights. Superficially, this line of thought has some appeal but it is specious and wholly untenable. We may concede, without deciding, that judged by the totality of its public functions this University may be likened to Marsh and Logan Plaza for the purpose of exercising First and Fourteenth Amendment rights in its public ways. But that is as far as the rationale of these cases takes us.
 
 
 14
 Marsh and Logan Plaza were concerned only with the delineation of public places for purposes of First Amendment activities. They were not concerned with state action in the internal affairs of these enterprises. There is nothing in the logic of these cases to support the notion that the owner-employers in either case could not dismiss an employee without due process, or that such action could, in any sense of the word, be deemed state action. Nor is there anything in the rationale of these cases to lend credence to the hypothesis that these students have a constitutionally protected right to close the doors of the university in order to enforce their demands, or that the disciplinary action taken against the students for such unauthorized conduct is state action redressible as a violation of the Civil Rights Act. We quite agree with Judge Frankel in Grossner, supra 287 F.Supp. at 549, that "No case anywhere and no acceptable extension of any pertinent principle, indicates that a University like [Denver] is engaged in `state action' when it takes such measures and conducts such procedures as those here in question."
 
 
 15
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 These demands concerned placing the name of a certain graduate student on the ballot for upcoming student elections and the immediate approval of a proposed "Bill of Rights" for students
 
 
 [2]
 The different types of disciplinary action are defined in the University Disciplinary Procedures as follows:
 "`Disciplinary probation' permits continuance in the University under stated conditions.
 * * * * *
 `Suspension' is severance from the University for a given period of time, after which the student may apply for readmission * * *
 * * * * *
 `Dismissal' * * * is permanent severance from the University."
 
 
 [3]
 The case was expeditiously heard May 28 and 29 (near the end of the school term) and the trial judge judiciously avoided the temptation "to take the time to what eventually is going to become a very important decision, I am sure, and that is the differences that may exist in the Federal Court's review of disciplinary proceedings of private institutions as contrasted with public institutions, and also, along the way, to add this Court's voice to the body of the law as to when a private institution becomes a part of the [state] for the imposition of the Fourteenth Amendment
 The Court to do this would, because of other commitments, would have to delay this matter inordinately and that would not accomplish the purpose of this proceeding which is to get a decision here that can be — at least have a chance of becoming finally determined before it is too late for the relief to be of any help to the students, if they are to obtain relief."
 
 
 [4]
 In Grossner, supra at 548, Judge Frankel very properly noted that in most cases finding state action in otherwise private endeavors the "critical `involvement' was in the very `discriminatory action' under constitutional attack."