**Fred McLEOD et al., Plaintiffs,**

v.

**COLLEGE OF ARTESIA et al., Defendants.**

**Civ. A. No. 8475.**

United States District Court, D. New Mexico.

May 1, 1970.

Jack Greenberg, New York City, Jonathan Sutin, Albuquerque, N. M., W. Haywood Burns, New York City, A. J. Cooper, Jr., Mobile, Ala., for plaintiffs.

Joel M. Carson and A. J. Losee, Artesia, N. M., for College of Artesia, James E. Gibson, Walt Ridlon, Howard Whitson and A. J. Losee.

## MEMORANDUM OPINION

BRATTON, District Judge.

This action is brought by the plaintiffs against the College of Artesia as a class action in behalf of themselves and the other black students at the college. They claim that the rules and regulations of the college are overly broad and vague and that certain action taken pursuant to them resulted in a denial to the plaintiff Fred McLeod of procedural due process. Also claimed is a violation of the First Amendment right of free speech, as well as discrimination practiced against black students by certain college employees and condoned by the college officials so as to make it official college policy.

Further, it is claimed, particularly by plaintiffs McLeod and Trotter, that a cause of action lies against the college for breach of contract.

The incident which precipitated the series of events culminating in this law suit occurred on March 17, 1970, in the college cafeteria, when one of the black students thought she overheard one of the cafeteria employees refer to another of the black students as "that nigger girl." Other black students were immediately informed, as were the cafeteria manager and the college president.

Upset by the reference, some black and white students staged a sit-in that evening and presented to Dr. Gibson, the college president, a list of demands they wanted met.

Some telephone negotiations were carried on between the college president and an N.A.A.C.P. lawyer acting in behalf of the black students. The president offered to and later did issue a policy letter from his office directing that the dignity and rights of all persons be respected by college employees. Other than that, all he ultimately agreed to do was to submit the black students' demands to the Executive Committee of the governing body of the college, its Board of Trustees.

The demands were three in number. First, the students demanded that the cafeteria employee be fired. Second, they demanded the firing of a student who was also employed by the college as a dorm counselor and who had admitted to being prejudiced against Negros. Third, they urged that no punitive measures be taken against any student who had participated in the sit-in.

The first two demands were not met by the Executive Committee, and the campus apparently remained in an uproar for several days.

On the evening of Saturday, March 21, a number of black and white students congregated in the lobby of the

campus dormitory. Present with them was the plaintiff Don Trotter, a black student who had left school the previous year and who had been refused re-admission in the Spring semester of this year for failure to comply with the then-existing haircut rule. His wife was also present at the gathering.

Trotter had been told by college officials on at least three previous occasions to stay away from the campus, but he had ignored such directives.

Present also was a white student who had been suspended from school with the admonition not to return to the campus.

Trotter's presence on campus had been for some time considered by college officials to be a disturbing influence, so Dr. Gibson on this evening had a warrant issued for Trotter's arrest.

Dr. Gibson summoned the Artesia police to effect Trotter's arrest but Trotter had already left the campus. He was subsequently arrested in town.

Throughout the evening there had been conversation about the black students' position at the college. At one point, one black male student named James told Dr. Gibson that if he couldn't handle his job he should quit.

Rather late in the evening, at a time when emotions were running high, a white female student named Wolfe was heard to remark, "This place is contaminated." At about this same time, Dr. Gibson had approached Mrs. Trotter, who was using the telephone in the dormitory lobby, and threatened her with arrest if she did not leave the campus. It was then that plaintiff McLeod allegedly said to Dr. Gibson, "You're crazy."

Dr. Gibson believed that both remarks were insults directed at him and told Miss Wolfe and McLeod to appear before the Student Standards the following Monday at 4:00 P.M.

Written notice was delivered to both McLeod and Miss Wolfe on Monday morning, and, while the notice to each was in error as to where the events had occurred, the notice correctly advised each of the two students as to what event had lead to a charge being filed against each. Both were advised that their faculty advisors could be present with them at the hearing.

McLeod, who had admitted that he knew at the time of the occurrence what the charge against him was to be, the next day consulted with two faculty members and called Mr. Jonathan Sutin in Albuquerque for legal advice. Advice was given, and McLeod thereafter conducted his defense in accordance with the attorney's advice.

On Monday afternoon the hearing was held as scheduled. Although he was denied permission to have a fellow student in the hearing with him, McLeod and the professor he had asked to help him were allowed to present all witnesses in his behalf they desired to present.

Evidence concerning the present charge against McLeod was adduced, and McLeod's record of past infractions at the college was also brought to the Committee's attention.

Following the hearing, the Committee deliberated for a four-hour period, during which its chairman (a faculty member) was seen going into the president's office. At the conclusion of the deliberations the Committee advised McLeod that it had voted to suspend him for the remainder of the semester for conduct injurious to the college. Miss Wolfe was placed on disciplinary probation but was not suspended by the Committee.

This action was then instituted, and a temporary restraining order reinstating McLeod as a student was sought, so that he could attend classes pending a hearing on the plaintiffs' demand for a preliminary injunction.

The temporary restraining order was granted, and the evidence set out above has now been presented as the basis for plaintiffs' demand for a preliminary injunction.

The threshold question that must be answered and upon which a determination has until now been reserved is the basis, if any, of the court's jurisdiction.

Strongly urged by the plaintiffs has been 42 U.S.C. § 1983, which requires state action or action under color of state law. To support their thesis that this section confers upon the court subject-matter jurisdiction, the plaintiffs have offered into evidence myriad facts relating to the origin, tax-exempt status, public purpose, public use of, and present structure of the college. A review of these facts does not, as is shown below, establish the connections necessary to find that the actions of the defendant college officials are under color of state law and hence within the meaning of § 1983.

■ The College of Artesia was established in 1966. The money with which it was established was raised by the city of Artesia pursuant to the Industrial Revenue Act, N.M.Stat.Ann. §§ 14–31–1 to 14–31–13 (1953), which, in general, allows municipalities of the state to issue bonds in order to finance projects which will promote the economy of such municipalities and the state. The Act does not permit any municipality to operate any project thus financed, nor does it permit any bonds issued under the Act to constitute an indebtedness or liability of any municipality.

In the present case the city of Artesia currently owns the land, buildings, and other property constituting the College of Artesia. It will continue to own the property for approximately another 30 years, or until the college becomes owner by virtue of having repaid the money thus advanced to establish it. Until then, the college occupies merely the nominal position of lessee under what is in reality a financing arrangement, and its payments cover the repayment of principal and interest on the bonds. This, among other important distinctions, differentiates the present case from Burton v. Wilmington Pkg. Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and no state involvement can be found merely because the college was initially financed by revenue bonds.

Also relied on as indicia of state action are the fact that certain city officials are also college officials, the fact that the college enjoys tax-exempt status and the fact that the college performs the function of education.

The plaintiffs contend that these things, together with the municipal financing of the college, place the college in a position of interdependence with the state and make state action of the acts of its officials.

A careful reading of Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969), reveals that it is determinative in the present case. Involved in Browns was the University of Denver, a private school, which, like the College of Artesia, was given preferential tax treatment by the state of Colorado. Both schools, of course, perform the function of education. As was true in Browns, there is no showing in the present case that the benefits conferred on the College of Artesia have any bearing on the activities of college officials and employees here challenged by the plaintiffs. In this case, as in Browns, the claimed involvement is in no way associated with the challenged activity. See Powe v. Miles, 407 F.2d 73, 74 (2 Cir. 1968); Grossner v. Trustees of Columbia University, D. C., 287 F.Supp. 535, 548 (S.D.N.Y.1968). Indeed, the present case is for practical purposes indistinguishable from Browns, and it is concluded that no showing has here been made to uphold jurisdiction on the basis of the above claimed acts of state involvement.

■ Plaintiffs also assert that the college property is so dedicated to a public use that, even though it may be private property, it should be deemed a public place for purposes of the First and Fourteenth Amendments. This is the rationale of Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L. Ed.2d 603 (1968), and Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L. Ed. 265 (1946).

The evidence offered in the present case to bring it within the scope of the rule of Marsh consists of a showing that the college cafeteria feeds an Army re-

serve unit once a month under a contract and that the college theater, located off the campus and consisting of a warehouse loaned to the college by a private citizen, is patronized by the public. Such evidence is not sufficient to support a conclusion that the college property is dedicated to a public use and therefore must be deemed a public place under *Marsh* and *Amalgamated Food Employees.*

This same evidence is offered to support plaintiffs' jurisdictional theory under 42 U.S.C. § 2000a. It suffices to say that it is also not enough upon which to premise jurisdiction under the public accommodations section of the Civil Rights Act.

■ As for plaintiffs' claim that 42 U.S.C. § 2000d confers jurisdiction, the facts establish that, out of a total of over three million dollars budgeted and spent by the college in its four-year existence, approximately $53,000.00 came from a governmental source. In addition, there is no showing, and, indeed, no claim that the federal programs under which the money has been received, e. g., the college work-study program, have in any way been discriminatorily administered.

Plaintiffs rely on Cypress v. Newport News General & Non-sectarian Hosp. Assn., 375 F.2d 648 (4th Cir. 1967), and Bossier Parish School Board v. Lemon, 370 F.2d 847 (5th Cir. 1967). The present case is very dissimilar to those cases, not only as to the amount of money involved, but also as to the relationship or connection between the use of such money and the alleged discriminatory practices.

■ It is also asserted that 42 U.S.C.A. § 1981 confers jurisdiction upon this Court to hear and determine the plaintiffs' claims upon the basis that the section gives them the right to make contracts. Reliance is placed upon Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), in which § 1982 was held effective sans any state involvement to enforce a strictly private property right, and upon Dobbins v. Local 212, I.B.E.W., 292 F. Supp. 413 (S.D.Ohio 1968), in which § 1981 was held available to enforce a union contractual right in the absence of governmental sanction, even though sufficient governmental participation, if needed, did exist in that case.

As for the claims of Trotter and McLeod of breach of contract, it is concluded that they are properly before the Court on the basis of diversity of citizenship and jurisdictional amount. Thus, it is not considered necessary to decide whether § 1981 also furnishes a jurisdictional basis for these claims. The evidence in the present case does not support a claim that any other plaintiff has been denied any contractual right.

Having concluded that jurisdiction under 42 U.S.C. §§ 1983, 2000a and 2000d is not present under the facts of this case, there remain only those contract claims advanced by the plaintiffs upon which jurisdiction can be premised.

As indicated above and here repeated for emphasis, only the plaintiffs Trotter and McLeod have contract claims. Plaintiff Don Trotter left school a year ago and was not a student at the time of the events giving rise to this action, but whatever evidence he may have to offer in support of his contract claim has not yet been presented. None of the other plaintiffs has been suspended or in any way prevented from exercising the rights and privileges available under the contract of each with the college.

Inasmuch as the only allegation properly before the court is premised upon contractual obligations, the preliminary injunction sought is not an appropriate remedy. Hence, the plaintiffs' demand for it will be denied, the temporary restraining order heretofore entered herein will be dissolved and except for the contract claims of Trotter and McLeod, the claims of all the plaintiffs against the defendants will be dismissed for lack of jurisdiction.