Timothy MILONAS, Jr., and Kenneth Rice, by and through their Attorney and Guardian Ad Litem, Kathryn Collard, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,

v.

Jack L. WILLIAMS, Owner and Administrative Director, Provo Canyon School; Robert H. Crist, Owner and Medical Director, Provo Canyon School; D. Eugene Thorne, Owner and Executive Director, Provo Canyon School, Defendants-Appellants,

John F. McNamara, Director and Administrator, Interstate Compact on Juveniles, Defendant.

Nos. 80–1569, 81–1407.

United States Court of Appeals, Tenth Circuit.

Sept. 13, 1982.

Rehearing Denied Nov. 9, 1982.

Kathryn Collard of Collard, Kuhnhausen, Pixton & Downes, Salt Lake City, Utah, and Mark I. Soler, San Francisco, Cal. (and Loren M. Warboys and Jan C. Costello, Juvenile Justice Legal Advocacy Project, San Francisco, Cal., with them on the brief), for plaintiffs-appellees.

Max D. Wheeler, Salt Lake City, Utah (Harold G. Christensen and Paul C. Droz of Snow, Christensen & Martineau, Salt Lake City, Utah, with him on the brief), for defendants-appellants.

Kathleen B. Boundy and Geraldine S. Hines, Attys., Cambridge, Mass., filed a brief on behalf of the Center for Law and Educ., amicus curiae.

Before McWILLIAMS and SEYMOUR, Circuit Judges, and BRIMMER,* District Judge.

* Honorable Clarence A. Brimmer, Jr., Chief Judge, U. S. District Court for the District of Wyoming, sitting by designation.

**934**

McWILLIAMS, Circuit Judge.

The Provo Canyon School for Boys, located near Provo, Utah, is a private school for boys between the ages of twelve and seventeen. Timothy Milonas, Jr., age fifteen, and Kenneth Rice, age sixteen, then students at the Provo Canyon School, brought the present action against the owners and operators of the Provo Canyon School.[1] Also named as parties defendant were various agencies, officers, and employees of the State of Utah.[2]

The individual plaintiffs, Milonas and Rice, challenged the education, treatment and conditions of confinement of juvenile boys placed at the Provo Canyon School and averred that the school administrators, acting under color of state law, had caused the plaintiffs to suffer and to be subjected to cruel and unusual punishment, antitherapeutic and inhumane treatment, and denial of due process of law. Milonas and Rice sought class action certification and, both

for themselves and the members of the class, asked for money damages and declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 (1976). The named plaintiffs also alleged that they had been denied a free appropriate public education and sought relief pursuant to the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401–1461 (1976) and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976).[3]

Pursuant to Fed.R.Civ.P. 23(a) and (b)(2), the district court provisionally certified the class. For purposes of the preliminary relief requested, the class was described as consisting of all juveniles residing at the Provo Canyon School during the pendency of the civil rights action. At that time, the district court also entered a preliminary injunction that enjoined four "behavior-modification" practices then in effect at the school.

1. Jack L. Williams, owner and administrative director of the Provo Canyon School, and Robert H. Crist, owner and medical director of the Provo Canyon School, were named as parties defendant in the original complaint filed on September 21, 1978. D. Eugene Thorne became the executive director of the Provo Canyon School on April 1, 1979, and was added as a party defendant on September 14, 1979. These defendants are appellants herein.

2. State defendants were: Anthony W. Mitchell, Director of the Utah Department of Social Services; the Utah Department of Social Services; James P. Wheeler, Director of the Utah Division of Family Services; the Utah Division of Family Services; John F. McNamara, Director and Administrator of the Interstate Compact on Juveniles; Walter D. Talbot, Superintendent of Public Instruction, Utah State Board of Education; and the Utah State Board of Education. These defendants were either dismissed from the lawsuit or entered into consent decrees. In this appeal, none of these defendants challenge the district court's disposition of the matter.

3. The claim against defendant McNamara, the director and administrator of the Interstate Compact on Juveniles for the State of Utah, was that he had failed to administer adequately his supervisory responsibilities regarding the placement of youths in Utah institutions. It was McNamara's job to supervise the placement in Utah of juveniles from other states sent to Utah by juvenile courts and other welfare agencies. Milonas and Rice alleged that

McNamara's negligence had resulted in their placement at the Provo Canyon School, where they were subjected to abusive treatment. During the course of the proceedings in the district court, the plaintiffs and defendant McNamara entered into a consent agreement in which defendant McNamara agreed, *inter alia*, to request that out-of-state officials remove boys from the Provo Canyon School and refrain from placing any other juveniles at the school.

The claim against defendant Talbot, the superintendent of public instruction for the State of Utah, and defendant Utah State Board of Education, was that each had failed to provide an adequate free appropriate public education for all handicapped children in the State of Utah as required by the Education for All Handicapped Children Act, 20 U.S.C. § 1412(2)(B) (1976). During the course of the proceedings in the district court, these defendants also entered into a consent decree with the plaintiffs. In this consent decree, the Utah defendants agreed, *inter alia*, that they were subject to the provisions of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976), and the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401–1461 (1976), and the regulations promulgated thereunder; to adopt regulations and procedures to implement these federal laws in the State of Utah; to monitor institutional compliance with the new state guidelines; and to provide a safe and free appropriate public education to all handicapped children in the State of Utah.

The plaintiffs' claim for money damages was tried to a jury; the district court reserved for its determination the claims for declaratory and injunctive relief. At the conclusion of a lengthy trial, the jury returned a verdict in favor of the defendants on the damages issue. Nonetheless, the trial judge later entered a permanent injunction as to those four school administrative practices that were the subject of the preliminary injunction previously entered. For purposes of this permanent relief, the district court certified a class consisting of all boys residing at the Provo Canyon School as of the date of the permanent injunction and in the future.

The permanent injunction specifically prohibited the defendants from: (1) opening, reading, monitoring or censoring the boys' mail; (2) administering polygraph examinations for any purpose whatsoever; (3) placing boys in isolation facilities for any reason other than to contain a boy who is physically violent; and (4) using physical force for any purpose other than to restrain a juvenile who is either physically violent and immediately dangerous to himself or others, or physically resisting institutional rules.

The district court later found that the plaintiffs were the "prevailing party" pursuant to 42 U.S.C. § 1988 (1976) and that they were entitled, therefore, to an award of attorneys' fees. The district court filed an exhaustive memorandum opinion wherein it made findings of fact and conclusions of law. This opinion was not published.

The district court then entered final judgment and fixed the attorneys' fees at $133,-546.54. For a discussion of the procedural history of this appeal, see *Milonas v. Williams*, 648 F.2d 688 (10th Cir. 1981).

The Provo Canyon School is privately owned and operated, although it does receive funds from both state governments and the United States.[4] The school was established in 1973 for the primary purpose of educating teenage boys whose problems are so severe that their treatment and education require a restricted, therapeutic environment. All of the boys admitted to the school have problems of one sort or another, including physical, psychological, and emotional problems, and are handicapped by a general inability to conform to normal behavioral standards. The district court described the school as follows:

> The Provo Canyon School is not a school in the traditional, ordinary or classic sense. It does offer classes on a secondary level to its resident population, and in most instances does a good job in its formal teaching. Provo Canyon School is also a correctional and detention facility. Students are restricted to the grounds. Students are confined. Some students are locked in and locked up with varying degrees of personal liberty restored as each progresses through the institutional program. If a student leaves without permission, he is hunted down, taken into custody and returned.
>
> Provo Canyon School is also a mental health facility. Adolescent males per-

---

4. Tuition at the Provo Canyon School is $1,600 per month. However, from the date of its inception as an institution in 1973, the Provo Canyon School has received significant amounts of government money to sustain its operations. Many of the boys are placed at the school by local school districts for special education purposes. School districts in California, Wyoming, Utah, Illinois, North Carolina, Alaska, New York, Minnesota, Washington, and Idaho have sent boys to the facility. These placements are accomplished through contractual arrangements between the local school officials and the Provo Canyon School administrators. Funding for the boys' special education comes from federal and state treasuries pursuant to the Education for All Handicapped Children Act and corresponding state special education laws. In 1979, the school received $566,278.24 from local school districts.

Additional governmental funding came from juvenile courts and probation departments and county governments and welfare agencies. The figures below demonstrate that the school relied heavily upon government financing:

| YEAR | GOVERNMENT FUNDS RECEIVED | PERCENT OF TOTAL FUNDS |
|------|---------------------------|------------------------|
| 1973 | $ 41,954.13 | 12.66 |
| 1974 | 131,196.66 | 25.29 |
| 1975 | 276,326.10 | 33.74 |
| 1976 | 118,150.31 | 13.22 |
| 1977 | 104,258.01 | 15.96 |
| 1978 | 434,225.50 | 21.00 |
| 1979 | 629,917.78 | 33.91 |

ceived to have mental health or emotional difficulties or who are chemically dependent persons, are counseled and treated. Adolescent males with forms of learning disability, physical, mental or emotional, are housed, counseled and "taught."

The student population, intermixed and various, is subjected to a form of "behavior modification" described by those who run the school as eclectic. Some of its salient features are isolation from the outside world, little or no communication with the outside world, physical confinement, physical punishment, progressive restoration of liberty, investigation and evaluation of student "attitude" and "truthfulness" and "future conduct" through the use of a machine, and counseling.

. . . .

Regardless of origin, condition or motivation, once arrived, each person during the beginning phases of the school program was locked in, isolated from the outside world, and whether anti-social, crippled or learning disabled, was subject to mandated physical standing day after day after day to promote "right thinking" and "social conformity." Mail was censored. Visitors were discouraged. Disparaging remarks concerning the institution were prohibited and punished. To "graduate" from confinement to a more liberated phase, one had to "pass" a lie detector test relating to "attitude," "truthfulness" and "future conduct." Some failed to pass and remained in confinement for extended periods of time.

Students generally are admitted to the Provo Canyon School at the insistence of one or both of their parents. Typically, the parents have had extreme disciplinary problems and being unable to control their child, have contacted the Provo Canyon School as a "last resort." Other boys are received at the school directly from juvenile courts and probation officers from across the nation. Many of the youths are placed at the Provo Canyon School by the boy's local school districts, with tuition funding coming from state and federal agencies pursuant to state special education laws and the federal Education for All Handicapped Children Act.

Plaintiff Timothy Milonas, Jr., had resided in the State of Nevada prior to being involuntarily committed to the Provo Canyon School by his mother. Milonas' commitment was a condition of probation imposed by a Nevada juvenile court. Milonas' father thereafter received a coded letter from his son, which letter implied that the son needed assistance. Because of that letter, Milonas' father independently contacted counsel regarding the school and how it was being run. Kenneth Rice, the other individual plaintiff, had resided in Alaska until his involuntary commitment to the Provo Canyon School. Rice was placed in the school pursuant to an order of an Alaska juvenile court. Four months after he was admitted to the Provo Canyon School, Rice ran away from the school, and, before he was returned, he made contact with an attorney and complained about conditions at the school. As a result of the complaints thus made by Milonas and Rice, the present action was instituted.

### Class Certification

Both Milonas and Rice were students at the Provo Canyon School on the date this action was commenced. On the date the complaint was filed, counsel for Milonas and Rice, fearing that the boys would be subject to retaliation by the defendants because of the commencement of the lawsuit, sought and obtained an immediate hearing before the district court. Based on such hearing and a stipulation between the parties, the district court ordered that Milonas and Rice be removed temporarily from the school and placed for the time being with the Utah State Division of Family Services. Each boy sought damages and injunctive relief for himself, and, in addition, they also asked for damages and injunctive relief for a class which they sought to represent. The class, according to the complaint, consisted of "all juveniles who have been, are now, or in the future will be placed at the Provo Canyon School." The district court provisionally granted plaintiffs' motion for class certification, and, later, at the conclusion of the trial, such grant was made permanent.

The first issue raised by the defendants in this appeal concerns the propriety of class certification. The defendants contend that the district court erred in granting the individual plaintiffs' request for class certification. This particular contention is based on either of two grounds. First, the defendants assert that by leaving the Provo Canyon School on the day that the lawsuit was filed, pursuant to the order of court to which reference was made above, Milonas and Rice lost membership in the class that they sought to represent. The defendants reason that Milonas and Rice, being "outsiders" at the time of class certification, could not represent those boys "inside" the school. In essence, the defendants aver that the named plaintiffs lacked standing to pursue the lawsuit on behalf of the class members. Second, the defendants assert that the individual claims of Milonas and Rice were not "typical" of the claims of the class members and, therefore, at the time of class certification, Milonas and Rice were merely "officious intermeddlers." Fed.R.Civ.P. 23(a)(3). We are not persuaded by either of these arguments.

■ It is axiomatic that an uninjured plaintiff cannot bring suit on behalf of an injured class. U.S.Const. art. III, § 2, cl. 1; *Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975); *Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–551, 7 L.Ed.2d 512 (1962). It is well settled, however, that a named plaintiff may continue to represent a class that has been certified as such even after the named plaintiff's personal stake in the outcome of the litigation has been mooted. *Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975). Furthermore, "[t]here may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion." *Id.* at 402 n.11, 95 S.Ct. 559 n.11. In such instances, the district court may apply a "relation back" theory and grant late certification in an otherwise moot case and thereby prevent mootness. *Id.*; *Napier v. Gertrude*, 542 F.2d 825, 828 (10th Cir. 1976), *cert. denied*, 429 U.S. 1049, 97 S.Ct. 759, 50 L.Ed.2d 765 (1977). *See generally* Note, Class Standing and the Class Representative, 94 Harv.L. Rev. 1637 (1981). The key to whether a particular case falls within that "narrow class of cases in which the termination of a class representative's claim [prior to class certification] does not moot the claims of the unnamed members of the class," *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11, 95 S.Ct. 854, 861 n.11, 43 L.Ed.2d 54 (1975), is whether the claim on its merits is "capable of repetition, yet evading review." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 398, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980).[5] Ours is such a case.

■ When the present action was instituted, Milonas and Rice were students in the Provo Canyon School, and as such were members of the class they sought to represent. Understandably, the boys were removed from the Provo Canyon School at the earliest possible date. The district court could not have been expected to rule on a

---

**5.** The Supreme Court's most recent pronouncement on this matter appears in *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 398, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980), wherein the Court noted that

[a]lthough one might argue that *Sosna* contains at least an implication that the critical factor for Art. III purposes is the timing of class certification, other cases, applying a "relation back" approach, clearly demonstrate that timing is not crucial. When the claim on the merits is "capable of repetition, yet evading review," the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation. E.g., *Gerstein v. Pugh*, 420

U.S. 103, 110 n.11, 95 S.Ct. 854, 861 n.11, 43 L.Ed.2d 54 (1975). The "capable of repetition, yet evading review" doctrine, to be sure, was developed outside the class action context.... But it has been applied where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim may arise again with respect to that plaintiff; the litigation then may continue notwithstanding the named plaintiff's current lack of a personal stake.... Since the litigant faces some likelihood of becoming involved in the same controversy in the future, vigorous advocacy can be expected to continue.

class certification motion prior to the date of the boys' removal from the school premises. Also, the district court's order placing the boys in the care of state officials was temporary in nature and, therefore, it was possible that the boys would be returned to the school. In our view, the fact that Milonas and Rice were removed temporarily from the school as a precautionary measure does not mean that they thereby lost their "personal stake" in the controversy. And most certainly the controversy itself was postured in a truly adversary setting. It is our conclusion, therefore, that Milonas and Rice satisfied the constitutional requirement of presenting a live case and controversy to the district court on behalf of themselves and the members of the class.

Defendants' "lack of typicality" argument is based primarily on the fact that Milonas' tuition at the school was funded by his parents and that Rice's tuition was funded by the State of Alaska, whereas other students were funded by different financial sources, including federal special education money. According to counsel, such demonstrates that the individual claims of Milonas and Rice are not typical of the class's claims. We disagree.

■ We note that in addition to Article III standing requirements, Fed.R.Civ.P. 23(a) lists four prerequisites to the certification of a class and the maintenance of a class action.[6] Upon the failure of the class representative to meet any one of the prerequisites of the rule, class certification will be denied. This determination, however, is a matter within the sound discretion of the trial court and the trial court's conclusions as to whether the class representative has

demonstrated that the numerosity, commonality, typicality, and adequacy of representation requirements have been met "will not be disturbed absent a showing of abuse of that discretion." *Rex v. Owens ex rel. State of Oklahoma*, 585 F.2d 432, 436 (10th Cir. 1978).

■ In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient. Factual differences in the claims of the class members should not result in a denial of class certification where common questions of law exist. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1189 (10th Cir. 1975); *Like v. Carter*, 448 F.2d 798, 802 (8th Cir. 1971). As we have stated previously, every member of the class need not be in a situation identical to that of the named plaintiff. *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir. 1975).[7]

Milonas and Rice, together with the class which they were certified to represent, have common claims against the defendants, i.e., that the disciplinary practices carried on at the school violated various constitutional and statutory rights of the individual plaintiffs and of the class. Regardless of their source of funding or, indeed, their individual disability or behavioral problems, all of the boys at the school were in danger of being subjected to the four enjoined "behavior-modification" practices. In our view, the typicality and commonality requirements of Fed.R.Civ.P. 23(a)(3) have been met. In sum, the district court did not err in granting class certification.[8]

6. Fed.R.Civ.P. 23(a) provides that a class action may be maintained only if the following requirements are met: (1) the class is so numerous that the joinder of all class members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

7. Defendants' reliance upon our decision in *Albertson's, Inc. v. Amalgamated Sugar, Inc.*, 503

F.2d 459 (10th Cir. 1974), is misplaced. In that case, we upheld the trial court's denial of class certification because we found that the party seeking to represent the class had interests antagonistic to the persons he sought to represent. *Id.* at 463. Such is not the case in the instant action.

8. No challenge is made on appeal to the district court's finding that the requirements of Fed.R. Civ.P. 23(a)(1) and 23(a)(4) were satisfied.

## State Action

Section 1983, 42 U.S.C. § 1983 (1976) provides, in essence, that any person who, under the color of state law, causes another to be deprived of rights secured by the Constitution or laws of the United States shall be liable to the injured party in an action at law or a suit in equity. 28 U.S.C. § 1343 (1976) confers original jurisdiction on federal district courts to hear proceedings brought under Section 1983. In the instant case, the plaintiffs alleged, and, at trial, attempted to show, that their constitutional and statutory rights had been violated by the owners and operators of the Provo Canyon School and that, in so doing, the defendants were acting under the color of state law. In awarding to the plaintiffs injunctive relief, the district court found that the enjoined practices were carried out under the cloak of state action. This conclusion was based on the fact that various states, be it through their juvenile courts or their school districts, had placed the plaintiffs, or at least many members of the class, in the institution, and that there was significant funding and regulation by the state. We agree.[9]

■ When a private party, as compared to a state employee, for example, is charged with abridging rights guaranteed by the Constitution or laws of the United States, the plaintiff, in order to prevail under Section 1983, must show that the private party was acting under the color of state law. The reason for this is fundamental. The fourteenth amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to the acts of the states, not to acts of private persons or entities. *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948); *Civil Rights Cases,* 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883). And Section 1983, which was enacted pursuant to the authority of Congress to enforce the fourteenth amendment, prohibits interference with federal rights by persons acting under color of state law. Conduct that constitutes "state action" for fourteenth amendment due process purposes is also action "under color of state law" for purposes of Section 1983 civil rights suits. *Lugar v. Edmondson Oil Co.,* —— U.S. ——, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *United States v. Price,* 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 1156 n.7, 16 L.Ed.2d 267 (1966). The United States Supreme Court has stated that the ultimate issue in determining whether a person is subject to suit under Section 1983 is whether the alleged infringement of federal rights is fairly attributable to the state. *Rendell-Baker v. Kohn,* —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

■ In our view, the district court's finding that the defendants, owners and operators of the Provo Canyon School, were act-

---

**9.** Having concluded that the district court had jurisdiction to issue the injunction under 42 U.S.C. § 1983 (1976) and 28 U.S.C. § 1343 (1976), we need not decide whether there was independent jurisdiction under the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401–1461 (1976) or under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976).

The Education for All Handicapped Children Act of 1975 is a funding statute, requiring states seeking and receiving funds under the Act to provide a free appropriate public education for all school age children in their jurisdiction. The requirements of the Act are set forth in the form of conditions on the receipt of federal funding. For a general review of the purposes of this Act, and the meaning of the term "free appropriate public education," *see generally Hendrick Hudson Dist. Bd. of Educ. v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73

L.Ed.2d 690 (1982); Hyatt, Litigating the Rights of Handicapped Children to an Appropriate Education: Procedures and Remedies, 29 U.C.L.A. L.Rev. 1 (1981); Note, Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103 (1979).

Section 504 of the Rehabilitation Act of 1973 provides, in pertinent part, that "[n]o otherwise qualified individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (Supp. III 1979). For a general review of this Act, *see Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372 (10th Cir. 1981).

ing under color of state law finds support in the record and is in accord with applicable law. In the instant case, the state has so insinuated itself with the Provo Canyon School as to be considered a joint participant in the offending actions. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Browns v. Mitchell,* 409 F.2d 593, 595 (10th Cir. 1969). Many of the members of the class were placed at the school involuntarily by juvenile courts and other state agencies acting alone or with the consent of the parents. Detailed contracts were drawn up by the school administrators and agreed to by the many local school districts that placed boys at the school. There was significant state funding of tuition and, in fact, the school itself promoted the availability of public school funding in its promotional pamphlet. There was extensive state regulation of the educational program at the school. These facts demonstrate that there was a sufficiently close nexus between the states sending boys to the school and the conduct of the school authorities so as to support a claim under Section 1983.

In the district court, defendants relied heavily on *Rendell-Baker v. Kohn,* 641 F.2d 14 (1st Cir. 1981). The defendant school involved in *Rendell-Baker* was indeed quite similar in its operation to the Provo Canyon School. The parties claiming a Section 1983 violation in that case were employees discharged from the school. The holding of the First Circuit in *Rendell-Baker* was that in discharging the plaintiffs the school officials had *not* acted under the color of state law. In so ruling, the First Circuit did comment, however, that *students* in the school there involved "would have a stronger argument than do plaintiffs that the school's action *toward them* is taken 'under color of' state law, since the school derives its authority over them from the state." 641 F.2d at 26 (emphasis in original).

On review, the Supreme Court affirmed the First Circuit's decision. *Rendell-Baker v. Kohn,* —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The Supreme Court phrased the issue there to be resolved as "whether a private school, whose income is derived primarily from public sources and which is regulated by public authorities, acted under the color of state law *when it discharged certain employees.*" *Id.* (emphasis added). As indicated, the Supreme Court held that state funding and regulation was not sufficient to support a finding of state action in the discharge by the private school of employees of the school. The Court recognized that "in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters." *Id.* To us, *Rendell-Baker* differs from the present case in at least one important respect. The plaintiffs in the present case are not employees, but students, some of whom have been involuntarily placed in the school by state officials who were aware of, and approved of, certain of the practices which the district court has now enjoined. *Rendell-Baker* does not control the Section 1983 issue before us.

### The Enjoined Practices

As indicated, the district court entered a permanent injunction which enjoined the defendants from their use of the polygraph, monitoring and censoring of mail, use of isolation rooms, and use of excessive physical force. In this regard, the district court found that the defendants' actions violated first and fourteenth amendment rights of the plaintiffs.

The trial of this case was a protracted one, lasting some four weeks. The district court heard testimony from numerous educational experts, present and former students in the school, present and former employees of the school, and from the defendants themselves. Needless to say, the testimony of these witnesses was in conflict to some appreciable degree. The plaintiffs' witnesses tended to paint a picture of undue punishment, if not outright brutality, in no wise related to the school's educational program. The defendants' witnesses, on the contrary, indicated that the school's disciplinary practices were a necessary adjunct to its educational program, and that the use of force or coercion was limited to those

extreme cases where a student was "out of control" and posed a threat to himself or others. It was on this sort of a record that the district court permanently enjoined four disciplinary practices. At the same time, the district court refused to enjoin nine other practices which the plaintiffs also sought to enjoin.

As noted, the district court did enjoin the defendants' use of the polygraph. Specifically, the district court made the following findings concerning the defendants' use of the polygraph:

As to the polygraph, the court has difficulty envisioning a set of facts that would justify the use of the polygraph on juveniles, either in the name of "therapy" or for security. That set of facts certainly did not exist at Provo Canyon School. Although there was some evidence offered in support of justification, and some evidence of "voluntary" use of the polygraph by boys, this device is inherently coercive and represents the most serious intrusion into the very thought processes of an individual. It was certainly used in a coercive manner at the Provo Canyon School. Refusal to take the polygraph resulted in punishment hours that boys had to sit or stand off and meant that a boy could not advance within the school program and could not leave the school. Boys were subject to punishment not only for what the polygraph revealed that they had done, but also for what the polygraph showed they had *thought* about doing. Until this court's Preliminary Injunction, all boys at the school were subject to the same polygraph policies, even those [boys] placed exclusively for special education and those [boys] with no record of juvenile offenses.

The school also used the polygraph to prevent the flow of any negative information about the school. Boys entered into agreements and even formal contracts with the school to obey the rules and avoid "negative thinking," which included saying bad things about the school. The polygraph was used to test performance of these agreements or con-

tracts. Boys even had to agree that after they left they would not say bad things about the school, and boys knew that any *intention* to violate that agreement would be revealed by the polygraph, and would prevent or delay their departure.

As concerns the defendants' monitoring of the students' mail, which the district court enjoined, the district court found as follows:

These policies were another vehicle for preventing any criticism of the school. All outgoing mail was read and boys were forced to "rewrite" letters containing things perceived as "untrue" by therapists, or containing "negative thinking" such as criticism of the school. Therapists even wrote comments such as "manipulative" in the margins of letters that boys were allowed to send. Boys knew that their outgoing mail was being read, which chilled the content of their letters even before they were written. One wonders why an institution that seems to be as proud of its programs as the Provo Canyon School would go to such great lengths to avoid critical comment.

As indicated, the Provo Canyon School maintained and used so-called "isolation rooms," also referred to as "prescription rooms," or "quiet rooms," or "time-out rooms." These rooms were approximately $4' \times 8' \times 9'$, were carpeted, contained no furniture, and had one small window in the door. Individual students were placed in these rooms as punishment for the violation of school rules or when the boys were believed to be emotionally or physically out of control. Boys placed in the isolation rooms were checked periodically by school authorities. As of the time this suit was commenced, the boys were not kept in the isolation room for more than 24 hours.

In regard to the use of physical force at Provo Canyon School, the evidence was conflicting, with the defendants' witnesses testifying, in effect, that the degree of force used was necessary and reasonable, and with the plaintiffs' witnesses testifying, in effect, that unreasonable force frequently

was used on the students. Brief mention should be made of the defendants' use of a practice nick-named the "hair dance." The Provo Canyon School Manual suggested that in dealing with a belligerent student, a school employee should grab one of the student's arms and clutch the boy's hair with his other hand. Such grabbing and pulling of the hair was believed to be the least harmful and, at the same time, the most effective way of bringing a student under control. In connection with the use of force at the Provo Canyon School, the district court found as follows:

> [A]lthough written school policies forbade excessive or inappropriate use [of force], actual practices varied from written policies, and excessive and inappropriate use of isolation and physical force took place. The "hair dance," designed as a means of controlling physically violent juveniles without causing them undue physical harm, was used in response to conduct other than physical violence or physical resistence, was used as punishment rather than simply for immediate control, was used as a threat, and on occasion resulted in the very physical injuries it was supposed to prevent.

> [T]he use of the term "out of control" as a justification for the basically uncontrolled discretion in subjecting juveniles to the P-Room and hair dance permitted unreasonably harsh school responses to the conduct of disturbed boys.

It was the defendants' position in the district court, as it is on appeal, that the practices enjoined by the district court are reasonably related to considerations of administration and security and are rationally directed toward the realization of legitimate and important objectives of education, therapy, and social rehabilitation. In this regard, the defendants accept the basic constitutional standards enunciated in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and assert that, under *Bell*, institutional restrictions which actually do infringe on specific constitutional guarantees still must be evaluated in the light of the legitimate objectives of the institution, and that a court should adopt a "reasonable relationship" test to effect the necessary balancing.

■ A person involuntarily confined by the state to an institution retains liberty interests that are protected by the due process clause of the fourteenth amendment. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Such person has the right to reasonably safe conditions of confinement, the right to be free from unreasonable bodily restraints, and the right to such minimally adequate training as reasonably may be required by these interests. *Youngberg v. Romeo*, —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Such person also has the right to be free from censorship of correspondence, because first amendment rights do not terminate upon institutionalization. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). And such person has the right to the privacy of his own thoughts, which cannot be probed by use of polygraph examinations.[10]

■ In assessing institutional restrictions, courts must take into account both the liberty interests of the individual and the legitimate needs of the institution for order and security. The district court below properly undertook a balancing process to determine whether the challenged disciplinary practices were so onerous as to overcome the legitimate administrative and security interests of the school. We are in accord with the district court's findings and conclusions on this matter because such are

---

**10.** The eighth amendment's proscription against "cruel and unusual punishment" does not apply in a situation, such as we have in the instant case, where the involuntarily confined person has not been adjudicated guilty of any crime. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S.Ct. 1861, 1871 n.16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Any institutional rules that amount to punishment of those involuntarily confined prior to an adjudication of guilt of criminal wrongdoing are violative of the due process clause per se. The district court below properly rejected the plaintiffs' claim that the Provo Canyon School had violated rights guaranteed by the eighth amendment.

amply supported by the record. Furthermore, we believe that the district court's conclusions of law are in accord with the applicable cases. *See Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (invalidating mail censorship by prison officials); *Lavine v. Wright*, 423 F.Supp. 357, 366 (D.Utah 1976) (upholding use of polygraph by *prison* officials for limited purpose only); *Pena v. New York State Div. for Youth*, 419 F.Supp. 203 (S.D.N.Y. 1976) (use of isolation rooms for punishment unconstitutional); and *Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974) (use of undue physical force invalidated).

## Parental Consent

As above indicated, in many instances a parent not only consented to the placement of a son in the Provo Canyon School, but also knew in advance of the very disciplinary practices enjoined by the district court. On appeal, the defendants argue that the district court failed to give "proper deference" to such parental consent. In this connection, it is *not* defendants' position that parental consent permits the defendants to violate students' constitutional rights. Rather, the defendants' position on this particular matter is that, in determining whether the enjoined practices bore a reasonable and rational relationship to the legitimate objectives of the Provo Canyon School, the district court failed to take into consideration, or give proper weight to, the fact that some parents consented to the enjoined "behavior modification" practices. We are not persuaded by this argument.

Children, as well as adults, have substantial liberty interests that are protected from state action by the fourteenth amendment. *See Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979); *In re Gault*, 387 U.S. 1, 27, 87 S.Ct. 1428, 1443, 18 L.Ed.2d 527 (1967). These liberty interests include the right not to be confined unnecessarily for medical treatment. *Parham v. J. R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979). Concomitant with this right is the right to be free of unnecessary restrictions of other fundamental rights once confined to a state institution. The district court below recognized that the boys placed at the Provo Canyon School retained certain fundamental rights that could be curtailed only if necessary to maintain order and security at the school. As indicated, the trial court, after balancing the various interests, and noting, incidentally, that some parents who had placed their boys in the school had knowledge of the school's disciplinary practices, concluded that the four enjoined practices were not necessary and that they unduly burdened the boys' constitutional rights. While judgments of a parent are to be considered by the court in determining the "necessity" of burdens placed upon children's fundamental rights, a parent cannot authorize the state to limit a child's liberty without showing good cause therefor. *Cf. Bellotti v. Baird*, 443 U.S. 622, 633–39, 99 S.Ct. 3035, 3042–3046, 61 L.Ed.2d 797 (1979); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 72–75, 96 S.Ct. 2831, 2842–2843, 49 L.Ed.2d 788 (1976). The district court's balancing process comported with proper constitutional procedure. We are in accord with its conclusion that the fact that some parents approved of the enjoined practices does not compel a finding that the practices were necessary.

## Attorneys' Fees

The district court awarded to the plaintiffs attorneys' fees in the amount of $133,-546.54 under 42 U.S.C. § 1988 (1976). On appeal, the defendants argue that if this Court should vacate the permanent injunction, then the plaintiffs would not be a "prevailing party," and, in such circumstance, the award of attorneys' fees should also be vacated. We agree. However, we are not reversing the district court in the present proceeding, but rather affirming.

The Honorable Bruce S. Jenkins, a United States District Judge for the District of Utah, presided over the trial of this case and later, in a separate hearing, awarded attorneys' fees. Prior to the hearing on attorneys' fees, the defendants

sought to have Judge Jenkins disqualify himself from setting the fee. The basis for this challenge was that, in 1965, long prior to his appointment as a federal district court judge, Judge Jenkins served as a member of the advisory council for the local chapter of the American Civil Liberties Union. Defense counsel argued that the American Civil Liberties Union represented Milonas and Rice in the present proceeding and that, in fact, it was the real party in interest. Judge Jenkins, who had handled pretrial matters and the lengthy trial, declined to disqualify himself in connection with the setting of attorneys' fees. We find no error. Indeed, the ground for disqualification, i.e., some minor connection with the ACLU fifteen years ago, is most tenuous on its face.

█ Defense counsel also suggests that the award of attorneys' fees against the defendant Dr. D. Eugene Thorne was not justified. We disagree. At the time of the entry of the permanent injunction, Dr. Thorne, along with Jack L. Williams and Robert H. Crist, was a co-owner and co-operator of the Provo Canyon School. Although Williams and Crist had been associated with the school from its inception, Dr. Thorne became associated with the school shortly after the commencement of the present action, initially as paid consultant, and later as executive director and part owner of the school. And, as indicated, he was serving as the executive director and part owner of the school when the permanent injunction was entered. We find no error in including Dr. Thorne as one of the defendants against whom the award of attorneys' fees was entered.

### The Consent Decrees

The three co-owners of the Provo Canyon School were not the only defendants named in the complaint. Also named as parties defendant were the Utah Board of Education and Walter D. Talbot, Superintendent of Public Instruction for the State of Utah. A consent decree was entered as to the Utah Board of Education and Talbot. This consent decree related to the regulation and monitoring by these particular defendants of special educational services for handicapped children in "private" institutions in the State of Utah, which institutions were receiving monies from the State of Utah, such monies, in turn, having been received from the federal government under the provisions of the Education for All Handicapped Children Act. In this connection, see also note 3, *supra*.

Another defendant named in the complaint was John F. McNamara, the Administrator of the Interstate Compact on Juveniles for the State of Utah. Juvenile courts in states outside of Utah placed boys at the Provo Canyon School facility. There was some dispute as to whether these placements were, strictly speaking, made under the interstate compact, or made directly by the placing state with the school. In any event, McNamara did make monthly visits to these out-of-state students and forwarded reports to the sending states concerning the students' health and general welfare.

The plaintiffs and McNamara also entered into a consent decree in which McNamara agreed: (1) not to approve any future out-of-state placements in Provo Canyon School or any other private juvenile educational facility in Utah unless such facility was approved by the Utah Division of Family Services; (2) to request, after thirty days, out-of-state sending officials to remove their placements from unapproved Utah facilities; and (3) to notify out-of-state Interstate Compact Administrators of the terms of the consent decree. As a part of the present appeal, the co-owners of the Provo Canyon School seek to have set aside and vacated this consent decree entered against McNamara.

█ The general rule is that a nonsettling party has no standing to appeal a consent decree which does not bind him and interferes with no legal relationship between the nonsettling party and the settling parties, even though the nonsettling party may have sustained some economic loss as a result of the consent decree. *Utility Contractors Ass'n of New Jersey, Inc. v. Toops*, 507 F.2d 83 (3rd Cir. 1974). We see

no reason to depart from that general rule in the instant case. Further, in our view, the consent decree itself appears to be a reasonable one, and, contrary to the contention of counsel, does not impose unlawful conditions.

Judgment affirmed.